*In the*

# UNITED STATES COURT OF APPEALS

*for the*

# FIRST CIRCUIT

SHAWN MCBREAIRTY

*Plaintiff-Appellant,*

v.

BREWER SCHOOL DEPARTMENT, GREGG PALMER, BRENT SLOWIKOWSKI, AND MICHELLE MACDONALD

*Defendants-Appellees.*

*On Appeal from the United States District Court
for the District of Maine
No. 1:24-cv-00053-LEW
The Honorable Lance E. Walker*

## EMERGENCY MOTION FOR
## INJUNCTION PENDING APPEAL

MARC J. RANDAZZA
JAY M. WOLMAN
RANDAZZA LEGAL GROUP, PLLC
30 Western Avenue
Gloucester, MA 01930
Tel: 888-887-1776
ecf@randazza.com

Plaintiff-Appellant Shawn McBreairty ("McBreairty") respectfully moves, per Fed.R.App.P. 8(a), for an injunction pending appeal.

## INTRODUCTION

Defendants-Appellees took issue with McBreairty's journalism about a local high school. This story is germane to an immediately raging debate about which restrooms transgender people may or should use. Appellees' immediately threatened McBreairty with government action: he must remove lawful content, and remove a lawfully obtained photograph, or they would take "further action." The threat referred to a criminal statute, civil claims, and administrative policies. McBreairty, fearful of the threat, took down his article, but then published the government's threats. The government then issued a follow-up threat, requiring him to remove even their demand. This government coercion was clearly unconstitutional.

McBreairty filed suit seeking injunctive relief protecting him from government retaliation if he republished. The District concluded that it could not issue an injunction without harming *the government's* First Amendment rights. Appellant asks that this Court implement interim relief pending the conclusion of its review to restore the status quo *ab initio*: that McBreairty can publish the story, photo, and the government's threat without fear of government reprisals. This is a common form of relief, on an issue this Court pronounced as clearly settled in *Jean*

*v. Mass. State Police*, 492 F.3d 24 (1st Cir. 2007).  This case is similar *Jean*, except the constitutional violation is more obvious and involves "hot news" where immediate relief is necessary.

## BACKGROUND AND PROCEDURAL HISTORY

**1.0 Factual Background**

**1.1 The Petition**

HW and CG attend Brewer High.[1]  *See* ECF 1, Verified Complaint ¶11-12; ECF 1-1, Declaration of HW ("HW Decl.").  HW and CG have safety and privacy concerns as to private spaces.  *See* Complaint, ¶13; HW Decl., ¶8.  HW and CG drafted a petition to change school policy.  *See* Complaint, ¶17; HW Decl., ¶13.

The inoffensive petition read:

### Petition to Keep Mens and Womens
### Biological Spaces to Their Respected Gender

*We want to bring awareness to the fact that womens and mens public spaces should be biologically separated, it's about the privacy and restrictions that need to be upheld for both men and women, things such as bathrooms, locker rooms, sports, and types of changing areas or sanitary stations should all be based on whether you are a biological girl or boy. When these rights of privacy are taken away from anybody it is unfair. This is a petition to keep the basic human rights of privacy and comfort that have been around for hundreds of years, untouched and unchanged.*

---

[1]  Due to their ages, all students are referred to by their initials.

Complaint, ¶17; HW Decl., ¶13. They distributed this petition, and many students signed it. *See* Complaint, ¶18; HW Decl., ¶14. Slowikowski and Assistant Principal, Fred Lower, opposed the petition and told the minors that their petition was "hate speech" and was like "supporting racial segregation." *See* Complaint, ¶¶29 & 30; HW Decl., ¶¶ 19 & 20. HW and CG withdrew the petition in the face of threats from the administration. *See* Complaint, ¶34; HW Decl., ¶23. HW's father reached out to McBreairty, to bring attention to this issue, to and seek public support for HW and CG's rights. *See* Complaint, ¶43; PW Decl., ¶10.

## 1.2 The Article

After reviewing evidence, speaking to witnesses, and researching the topic and facts, McBreairty published an article entitled "Girl's Bathrooms are Not 'Safe Spaces' When Males are Present" on *[your]NEWS* ("Article") on February 12. Complaint, ¶46; ECF 1-3.

McBreairty shared his opinions and reported on the petition. Complaint, ¶¶ 49 & 50. He reported how Brewer High School teacher Defendant-Appellee Michelle MacDonald reacted, threatening the students that she would have them charged with hate crimes and how MacDonald, through Slowikowski, precluded the students from circulating the petition. Complaint, ¶52.

McBreairty described MacDonald referring to *MacDonald v. Brewer Sch. Dep't*, 651 F. Supp. 3d 243, 252 (D. Me. Jan. 12, 2023). Complaint, ¶¶53 & 54.

McBreairty reported on poor academic outcomes at Brewer High School, criticized Appellees' law firm, and criticized the Brewer School Committee and its chair, Kevin Forest. Complaint, ¶56. And, McBreairty provided his understanding of *Doe v. Reg'l Sch. Unit 26*, 2014 ME 11 (2014). McBreairty described Brewer policies as being unsafe, referring to the Virginia instance. Complaint, ¶58. McBreairty encouraged the public to attend a School Committee meeting and provide public comment for the issues under consideration. Complaint, ¶59.

### 1.3    Brewer's Demands

On February 13, 2024, Appellees threatened McBreairty that, if he did not edit the Article by noon the next day, Appellees would be "**forced to take further action**" against him. Complaint, ¶60; ECF 1-5.

Appellees claimed that the Article invaded the privacy of HD, a third party, violated Appellees' policies ACAD, ACAF, and JICK, and violated 20-A M.R.S. Section 6553 and 6554. Complaint, ¶62. McBreairty lawfully obtained the photograph, but Appellees asserted that McBreairty could not publish it, claiming that he was in violation of a **criminal statute,** 17-A M.R.S. § 511, by merely publishing it. Complaint, ¶63. Fearing government action,[2] McBreairty reluctantly removed the Article. Complaint, ¶66. Depublishing the article for even a day causes

---

[2]    The same Attorney and firm filed suit against him on identical theories in *Hermon School Department v. McBreairty*, Docket No. CV-2022-00056 (Penobscot Sup. Ct., filed May 3, 2022). Complaint, ¶65.

an irrevocable deprivation of his rights.  Complaint, ¶67.  He desires to republish and intends to do so upon obtaining an injunction.  Complaint, ¶70.

In place of the Article, McBreairty published Appellees' threat.  Complaint, ¶71.  Publishing the threatening email itself was reporting on an issue by a public body on a matter of public concern.  Complaint, ¶73.  On February 14, Appellees demanded that the threat be removed.  Complaint, ¶74; ECF 1-6.  McBreairty complied, but he intends to republish upon obtaining an injunction.  Complaint, ¶76.

## 2.0    Procedural History

McBreairty filed suit on February 22, 2024.  *See generally,* Complaint, ECF 1.  That same day, McBreairty filed an Emergency Motion seeking a temporary restraining order and a preliminary injunction.  *See generally*, Motion, ECF 4.  He sought to enjoin Appellees from taking adverse or coercive action against him for publishing the Article or the letter.  *See id.*, 20.  McBreairty also asked that Appellees be enjoined from applying school policies to him.  *See id*.

The Motion was fully briefed—Appellees opposed (ECF 15 & 16), and McBreairty replied (ECF 23).  The District Court requested supplemental briefing on whether the photograph in McBreairty's article is protected speech (ECF 24, 25, 26, & 27).  The District Court held an in person hearing with all parties fully represented.  ECF 28.  The hearing lasted for approximately one and a half hours.  *See* Transcript of Motion Hearing, **Exhibit 1**.

Two weeks later, late in the day before a holiday weekend, the District Court issued a four-page Order favoring government suppression. *See* Order, ECF 30, (**Exhibit 2**). The District Court determined although there was standing to challenge the "implied threat of litigation," an injunction would violate governmental First Amendment rights. *See id.*

McBreairty noticed his Appeal on March 29. ECF 32. That same day, he moved the District Court for an injunction pending appeal. ECF 33. Appellees opposed (ECF 34 & 37), and McBreairty replied (ECF 40). On April 10, the District Court denied the motion. *See* ECF 41, **Exhibit 3**.

## JURISDICTIONAL STATEMENT

This appeal relates to an interlocutory order refusing an injunction. *See* 28 U.S.C. § 1292(a)(1) (granting jurisdiction). A party may appeal an order denying a temporary restraining order where, "after full presentation by the parties," such denial "has the effect of the refusal of 'an injunction' within the meaning of 28 U.S.C. §1292(a)(1)." *Spencer Cos. v. Armonk Indus., Inc.*, 489 F.2d 704, 706 (1st Cir. 1973). Such a "practical effect" arises where "there has been a full adversary hearing, or, in the absence of review, further interlocutory relief is unavailable." *Pena v. Fortuno*, 582 F.3d 131, 133 (1st Cir. 2009), citing *Levesque v. State of Maine*, 587 F.2d 78, 79 (1st Cir. 1978).

The District Court stated that it would only consider ruling on the preliminary injunction after Appellees could conduct discovery and an evidentiary hearing could be held (which could include the trial on the merits). Order, 4. The Order fails to explain why evidence or discovery is needed. Instead, the rationale for denying relief was that it believed that enjoining Appellees would violate the government's right to petition. This is solely a matter of law, and no evidence or testimony are necessary. The District Court couched this concern as a finding on the likelihood of success, but the Court did not elaborate as to the substance of McBreairty's claims. *See* Order, ECF 30, 2-4.

When raised below, the District Court stated that McBreairty "misse[d] the operative point" of its decision and was concerned that McBreairty "request[ed] that [it] spell out for him at length the kind of evidence [the Court] believe[s] would be material to a preliminary injunction hearing." Order, ECF 41, 2. The District Court continued to state, however, that it "previously cited authorities [McBreairty] might consider reading," and further reiterated its position, based solely on interpretations of law, that the Court would not enjoin Appellees' ability to file civil litigation. *Id.*, 2-3. The Order again did not address what or why evidence was needed. *Id*. The Court also ignored the criminal threats and the administrative threats, both in its initial order and in its order denying injunction pending appeal. No material facts are in dispute.

This Court should also consider timing when considering the request before this Court. The District Court took two weeks to issue a 4-page order on an emergency motion, undertaking almost no analysis and saying that it could not resolve undisputed facts, while inventing governmental First Amendment rights, necessitates the intervention of the appellate court – by the time the lower court process is complete, the news situation will have fully dissipated–and the government's unconstitutional coercion will be successful. It has been two months since the threat, and, since the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976), McBreairty continues to be irreparably harmed daily. The order was a functional denial of a preliminary injunction, and this is a "hot news" situation requiring immediate relief.

Finally, the Parties have already benefitted from much more than a full adversary hearing. The Parties extensively briefed the issues through principal briefs, two rounds of supplemental briefs, and extensive oral argument. The Parties submitted declarations, and the District Court was able to consider each Party's argument without issue. And the District Court made clear in its subsequent order it will not reconsider its position.[3] This Court, therefore, has jurisdiction.

---

[3] Notably, the District Court did not assess Appellees' putative claims. No evidence is needed—they all would fail as a matter of law—either for lack of

## ARGUMENT

### 1.0     Legal Standard

An appellant seeking an injunction pending appeal must "make a strong showing [1] that they are likely to succeed on the merits, [2] that they will be irreparably injured absent emergency relief, [3] that the balance of the equities favors them, and [4] that an injunction is in the public interest." *Together Emples. v. Mass. Gen. Brigham Inc.*, 19 F.4th 1, 7 (1st Cir. 2021).

### 2.0     McBreairty is Entitled to an Injunction

#### 2.1     McBreairty has Standing

When a plaintiff "is chilled from exercising [his] right to free expression or forgoes expression in order to avoid enforcement consequences he … demonstrates constitutional standing." *Mangual v. Rotger-Sabat*, 317 F.3d 45, 57 (1st Cir. 2003). Twice, Appellees threatened McBreairty to de-publish lawful material or he would suffer adverse governmental action. Facing a threat of criminal, civil, administrative, or other government action should he republish, McBreairty has standing.

#### 2.2     McBreairty is Likely to Prevail

McBreairty bring three claims: (a) First Amendment retaliation: 42 U.S.C. §1983; (b) 5 M.R.S. §4682 for violation of the First Amendment and of Art. I., §§4 & 15 of the Maine Constitution; and (c) a declaratory judgment that Appellees may

---

standing (they cannot assert claims belonging to HD or MacDonald's child) or for failure to state a claim (the policies and statutes asserted do not apply to McBreairty).

not apply their internal policies to McBreairty. Section 1983 provides a remedy for infringement of constitutional rights. *Alfano v. Lynch*, 847 F.3d 71, 74 n.1 (1st Cir. 2017). McBreairty alleges facts to establish that Appellees intentionally interfered with his constitutional rights. *See* 5 M.R.S. § 4682; *Andrews v. Dep't of Envt. Prot.*, 1998 ME 198, ¶23, 716 A.2d 212. There is no legitimate dispute that Appellees acted under color of state law or threatened McBreairty—thus, the only issue is whether they interfered with/transgressed his constitutional rights. They did.

McBreairty is likely to prevail. "The right to petition is one of the most precious of the liberties safeguarded by the Bill of Rights and is made applicable to the states by the Fourteenth Amendment." *Nader v. Me. Democratic Party*, 2012 ME 57, P21 (cleaned up). School bathroom policy is an issue under consideration by both the Superintendent and Principal, who are executive officials of the Brewer School Department, and the Brewer School Committee, its legislative arm, and the petition was in connection with such issue, it is reasonably likely to encourage them to consider or review the issue, and it is reasonably likely to enlist public participation in an effort to effect such consideration. *Mangual v. Rotger-Sabat*, 317 F.3d 45, 56-57 (1st Cir. 2003); Complaint at ¶45.

Prohibiting criticism and reporting on a petition is unconstitutional viewpoint and content-based discrimination. Appellees purport to recognize McBreairty's right to report on and opine on matters of public concern, but then concoct reasons

to demand removal.  They raise a concern with (a) a picture of four people already widely circulating on social media; (b) statements that identify and discuss HD; and (c) statements about MacDonald and her motivations.  Yet, reporting on high school students or teachers is not unprotected speech.  McBreairty offered publications lauding and naming students and teachers. *See* ECF 4-1; ECF 4-2, Declaration of Cassidy S. Flavin ("CSF Decl.") at ¶4.  But, when McBreairty did the same, on a different subject matter, and with a negative opinion, he was threatened by the government with legal action.

Content and viewpoint-based restrictions are subject to strict scrutiny.  *See McCullen v. Coakley*, 573 U.S. 464, 478 (2014). Such a speech restriction "requires the government to demonstrate that the restriction advances a 'compelling interest' and is 'narrowly tailored to achieve that interest.'" *Signs for Jesus v. Town of Pembroke*, 977 F.3d 93, 101 (1st Cir. 2020), quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015).  Such restrictions must be "necessary." *R.A.V.,* 505 U.S. at 395.  The demands for censorship serve no interest and are not narrowly tailored.

Appellees claim the speech is unprotected because in their opinion, it is false.  They fail to identify any falsehoods.  ECF 1-5.  Even if they did, the government does not have the power to decide what it thinks is truthful commentary and threaten those with whom it disagrees, coercing them into silence by threatening criminal, civil or administrative penalties.

> *It cannot be the duty, because it is not the right, of the state to protect the public against false doctrine. The very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind through regulating the press, speech and religion. In this field every person must be his own watchman for truth, because the forefathers did not trust any government to separate the truth from the false for us.*

*Thomas v. Collins*, 323 U.S. 516, 545 (1945) (Jackson, J. concurring).

There is no "general exception to the First Amendment for false statements." *United States v. Alvarez*, 567 U.S. 709, 718 (2012). Even assuming *arguendo* a false statement, the government may not claim that an article must be censored because in the government's sole opinion, it is false. History is replete with examples of governments lying to their constituents. As Justice Black observed in *New York Times v. United States*, 403 U.S. 713, 717 (1971):

> [o]nly a free and unrestrained press can effectively expose deception in government. And paramount among the responsibilities of a free press is the duty to prevent any part of the government from deceiving the people and sending them off to distant lands to die of foreign fevers and foreign shot and shell … In revealing the workings of government that led to the Vietnam war, the newspapers nobly did precisely that which the Founders hoped and trusted they would do.

To accept this as a necessary, compelling government interest would make the term "abuse of discretion" blush.

Appellees also claim the statements and the lawfully obtained photo are "an impermissible invasion of the privacy of minors and have the effect of bullying and hazing a student and a teacher at the Brewer High School in violation of Board Policies ACAD, ACAF and JICK and Maine law." ECF 1-5. The criminal statute

that they invoked was 17-A M.R.S. Section 511. They also invoked 20-A M.R.S. Sections 6553 & 6554. *Id.* Mr. McBreairty violated none of them, but the government threatened him with **criminal sanctions** for publishing a photo.

Section 511 does not apply. Only a person entering or engaging in surveillance could be in violation, not someone who publishes a photo. McBreairty did not take the photograph, nor did he trespass. Since McBreairty acquired it lawfully, he has a clearly-established right to publish it. *See, e.g., Bartnicki v. Vopper*, 532 U.S. 514 (2001); *Jean v. Mass. State Police*, 492 F.3d 24 (1st Cir. 2007). Complaint, ¶ 64.

In this photo, nobody is in a state of undress nor engaged in private bodily functions. Rather, they are standing as a group with no expectation of privacy. And, as noted above, under *Bartnicki* and *Jean*, there is no governmental interest in restricting publication of a lawfully-acquired image (even *if* the original photographer may have unlawfully created it). This is *in pari materia* to *Jean*, where the First Circuit presumed, *arguendo*, that a video was unlawfully made. However, since Jean was not the one who made it, the government had no authority to censor it. Here, the District Court did not recognize *Jean* as controlling authority.

Neither do the other statutes invoked apply to McBreairty. 20-A M.R.S. §6553(2) only applies to a "student, staff member, group or organization affiliated with the public school," making it inapplicable to McBreairty. Similarly, 20-A M.R.S. §

6554(3) highlights that it only applies to conduct on school grounds, and McBreairty was not on school grounds. Nevertheless, the government threatened McBreairty with legal action because it claimed he violated them.

A government threat to apply inapplicable school policies to McBreairty seems ludicrous, but there is history that makes this threat the most chilling of all. In *Hermon, supra*, the government, represented by the same law firm (DrummondWoodsum) and the same lawyer, (Attorney Hewey) claimed that McBreairty violated its bullying and hazing policies – despite the fact that they did not apply to him. They sued to restrain McBreairty from continuing to criticize the Hermon school district on his podcast, and to restrain him from making public records requests. *Hermon, supra* at p.9. Attorney Hewey claimed in that case that the school policies "absolutely" apply to McBreairty, but in this case, trying to evade an injunction, she took the opposite view. *Contrast, e.g. id.* at ¶¶1 & 52 with ECF 16 at 8. Meanwhile, the threat letter speaks for itself. *See* **Exhibit 4**.

The policies invoked are: ACAD, the "Hazing" policy, which restricts actions only by those who are part of the Brewer school system—not outside journalists like McBreairty. ECF 4-3;[4] CSF Decl. at ¶5. ACAF, the "Workplace Bullying" policy, which regulates employees, students, parents, community members, and others

---

[4]    Available at https://docs.google.com/document/d/1IoMtrBrOiuRXhbjeQf2w ZSVU1m-H7sAzMY1KdxJq0-4/edit.

involved in the school. ECF 4-4; CSF Decl. at ¶6. Policy JICK, the "Bullying" policy regulates only students, employees, volunteers, contractors, visitors, and school-affiliated organizations. ECF 4-5; CSF Decl. at ¶7. If teachers may not be "compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work," then, McBreairty, a non-teacher, cannot have his rights infringed when writing about such matters himself. *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968); *compare Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038 (2021) (observing the little leeway schools have to regulate a *student's* off-campus speech). McBreairty should not need to suffer through a second frivolous "*Hermon theory*" lawsuit, and then have his sole remedy be the right to hire counsel to defend it.

Appellees' second issue in the threat is that McBreairty made two statements that identified HD. He has a right to do that. *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469 (1975) clearly established that even publishing the name of a minor rape victim is protected. HD is an accused *perpetrator* of sexual assault. ECF 1-1 at ¶¶ 11 & 12. There is no interest here that falls outside of this clearly established law.

Appellees' third issue is the statement concerning MacDonald's child. However, this statement expressly quoted the line "MacDonald has a transgender child who attends a different school" from *Macdonald v. Brewer Sch. Dep't*, 651 F.

- 15 -

Supp. 3d 243, 252 (D. Me. Jan. 12, 2023), and provided commentary thereon regarding the child's activities. Not only is there no compelling interest in precluding discussion of the child, it was used to highlight MacDonald's bias against the petitioning students. Quoting from judicial proceedings is protected under the fair report privilege. *See, e.g., Kampf v. Maine Publ. Corp.,* 1998 Me. Super. LEXIS 259, *2-3 (Cumberland Cty. Sup. Ct. Oct. 20, 1998) (citing Restatement (Second) of Torts, §611 (1977) recognizing the privilege). This privilege protects those who "fairly and accurately report certain types of official or governmental action," rendering them immune from lawsuits arising out of such reports. *Yohe v. Nugent*, 321 F.3d 35, 42 (1st Cir. 2003). Appellees, have no interest in restricting McBreairty's report on MacDonald's prior litigation, the outcome thereof, and her biases as to the petitioners.

Neither have Appellees a compelling interest in demanding the removal of their threats. The sole basis is that the threat reprints the content Appellees want to censor. ECF 1-6. However, it was Appellees' choice as to what to include, and the reporting of the takedown demand is itself an issue of public concern and an official proceeding protected under the fair report privilege.

McBreairty's reporting and publishing was fully protected, and should not be suppressed because of governmental coercive threats.

### 2.3    Plaintiff Has Been Irreparably Harmed

The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). "[A] plaintiff's irreparable harm is inseparably linked to the likelihood of success on the merits of plaintiff's First Amendment claim." *WV Assn'n of Club Owners v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009). Thus, if the plaintiff demonstrates a likelihood of success, they also establish irreparable harm. *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 15 (1st Cir. 2012).

### 2.4    The Balance of Equities Tips in Plaintiff's Favor

"Protecting rights to free speech is *ipso facto* in the interest of the general public." *McBreairty v. RSU22* at *31-32. Other members of the public are chilled from speaking. They see McBreairty twice threatened and no citizen of ordinary firmness would risk speaking reporting on controversial issues if this is tolerable. Further, members of the public have a right to read McBreairty's reporting. Even the government is harmed if it cannot hear how its employees are performing. Enjoining that self-inflicted harm is in the public interest.

McBreairty is only seeking injunctive relief against the Appellees in their official capacities. To whatever extent the individuals may claim they have a cause of action, the issuance of an injunction against the Appellees would not prevent them, personally, from seeking relief against McBreairty. Accordingly, there is no

risk of harm which could stem from an injunction being issued here.

## 3.0    The District Court Erred

The District Court only identified a single issue as preventing the issuance of injunctive relief—that enjoining Appellees from filing frivolous civil litigation would violate Appellees' rights to petition the courts.[5]  McBreairty sought *much more than that*: he sought an injunction against *any* action, as the government vaguely threatened "action," which could be criminal, civil, administrative, or other action.  Appellees threatened use of a criminal statute and they claimed they could apply their policies to him.[6]  *Id.*  If the District Court could not enjoin a civil action, it should have granted the other injunctive relief.  But, the District Court refused to address it, even when reiterated in the motion for injunction pending appeal below.

Appellees' threatened litigation should be enjoined.  The government argues that they should be free to file suit against McBreairty if he republishes his article, and if this violates his First Amendment rights, then he has a remedy in the form of being able to defend himself.  This is no remedy.  The cases cited are inapposite.  Although the District Court correctly quoted *Tomaiolo v. Mallinoff*, 281 F.3d 1, 11 (1st Cir. 2002) as to avoiding "an interpretation of §1983 so broad as to encompass

---

[5]    It does not relate to the substance of McBreairty's claims—it relates solely to the ability of the Court to issue one aspect of the injunctive relief sought.  At best, the District Court's analysis relates to the balance of equities.

[6]    They now argue that these policies do not apply, but that is directly contrary to the arguments their attorneys made to the Maine Law Court in the *Hermon* matter.

petitions for government action[,]" the *Tomaiolo* decision expressly thereupon cited to "*Munoz Vargas v. Romero Barcelo*, 532 F.2d 765, 766 (1st Cir. 1976) ('There is no remedy … against private persons who urge the enactment of laws, regardless of their motives.')." That is, there is a policy against enjoining "private persons," not government entities and officials, as Appellees are here. "The Free Speech Clause restricts government regulation of private speech." *Pleasant Grove v. Summum*, 555 U.S. 460, 467 (2009). In contrast, "a state entity[] itself has no First Amendment rights[.]" *Student Gov't Ass'n v. Bd. of Trustees*, 868 F.2d 473, 481 (1st Cir. 1989). *Tomaiolo* is inapposite. Meanwhile, it is clearly established that a federal court may even enjoin *ongoing state proceedings*. As the Supreme Court found, 42 U.S.C. § 1983 expressly authorizes such federal action. *Mitchum v. Foster*, 407 U.S. 225, 242-43 (1972). However, the District Court claimed that Section 1983 precludes enjoining the pursuit of criminal, civil, or administrative action against. Federal Courts may enjoin criminal, civil, and administrative action.

Moreover, baseless and sham litigation is not protected by the First Amendment. Order at 3. A court may enjoin a party from filing frivolous and vexatious lawsuits. *See, e.g., Gordon v. Department of Justice*, 558 F.2d 618 (1st Cir.1977); *Clinton v. United States*, 297 F.2d 899, 902 (9th Cir.1961).

When the government threatened McBreairty, it was quite confident that it had the legal authority to do so. Now, it only suggests that the government "might"

wish to bring a claim for defamation, which the government can never bring, for invasion of privacy, which it cannot bring, or the "*Hermon Theory*," which it threatened in its demand. The very author of the demand here was the signatory on a frivolous and vexatious suits based on the same threatened theories. *Hermon, supra*. At the very least, a copycat of the *Hermon* lawsuit must be enjoined.

A government suit for defamation would also be frivolous. The government does not have reputational rights, and it may not bring a defamation claim against a journalist. "[F]or good reason, no court of last resort in this country has ever held, or even suggested, that prosecutions for libel on government have any place in the American system of jurisprudence." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 291-92 (1964) (cleaned up). The government does not have privacy rights either. While the "privacy" threat was factually baseless, speaking on matters of public concern overrides any right to privacy. *See, e.g., Florida Star v. B.J.F.*, 491 U.S. 524 (1989); *Daury v. Smith*, 842 F.2d 9, 14 (1st Cir. 1988). No testimony nor evidence can change that. Nor would Appellees have standing to bring such claims on behalf of third parties, let alone that such would have pretense to merit. Moreover, all of the speech is either republication of lawfully-acquired material under *Bartnicki/Jean*, is true (and there are no genuine issues of material fact in dispute),[7] and/or is protected

---

[7] While there is a dispute about whether counsel was an agent of MacDonald, McBreairty does not seek an injunction as to personal capacity. Similarly, whether

opinion.  Yet all of it remains subject to government threat.  If the government has a non-frivolous legal theory, it has had ample opportunity to present it.  But, McBreairty should not have to wait to find out if he might be the victim of a frivolous action.  As the District Court's order was in error, this Court should give it no weight.

## 4.0    No Bond, or at Most, a Minimal Bond, Should Be Required

However, a bond should only be required if the enjoined party will suffer harm from the issuance of the injunction. *See Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 285 (4th Cir. 2002).  Appellees will suffer no harm, as an injunction will repair the *status quo* and allow the First Amendment to flourish.  McBreairty requests that the injunction issue with no bond.

## CONCLUSION

Appellees are being sued because of coercive threats to intimidate McBreairty from exercising his First Amendment rights.  Rather than righting the wrong, the District Court claimed that it was actually *McBreairty* that was doing the censoring.  Injunctive relief must issue while the appeal is decided so that McBreairty's First Amendment rights may be restored.

---

HD committed a sexual assault is immaterial to the question of whether Appellees may restrain McBreairty's publication of allegations, especially where Appellees lack standing to sue McBreairty for defaming a student (and as the student was a limited purpose or involuntary public figure prior to McBreairty's article and the allegations related to a matter of public concern, there is no factual question that suggests McBreairty did so with "actual malice").

Date: April 15, 2024.               Respectfully submitted,

RANDAZZA LEGAL GROUP, PLLC

/s/ Marc J. Randazza
Marc J. Randazza (Bar No. 90629)
Jay M. Wolman (Bar No. 1135959)
30 Western Avenue
Gloucester, MA 01930
Tel: (888) 887-1776
ecf@randazza.com

*Attorneys for Appellant*
*Shawn McBreairty*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), I certify that:

This motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because this motion contains 5,062 words, excluding the parts of the motion exempted by Fed. R. App. P. 32(f).

This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this motion has been prepared in a proportionately spaced typeface using Microsoft Word Times New Roman 14-point font.

Counsel for the parties met and conferred on April 15, 2024 telephonically; Appellees all oppose the requested relief.

Date: April 15, 2024.                RANDAZZA LEGAL GROUP, PLLC

                                     /s/ Marc J. Randazza
                                     MARC J. RANDAZZA

**CERTIFICATE OF SERVICE**

I hereby certify that on April 15, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: April 15, 2024.                    RANDAZZA LEGAL GROUP, PLLC

/s/ Marc J. Randazza
MARC J. RANDAZZA

# **Exhibit 1**

Transcript of Motion Hearing

1    **UNITED STATES DISTRICT COURT**
            **DISTRICT OF MAINE**
2
     _____
3

     **SHAWN MCBREAIRTY,**
4
              **Plaintiff,**              **CIVIL ACTION NUMBER:**
5
              **-vs-**                    **1:24-cv-00053-LEW**
6
     **BREWER SCHOOL DEPARTMENT, et al.,**    Motion Hearing
7
              **Defendants.**
8    _____
             Margaret Chase Smith United States Courthouse
9            202 Harlow Street
             Bangor, Maine 04401
10           March 14, 2024

11   **B E F O R E:**        **THE HONORABLE LANCE E. WALKER**
                            **UNITED STATES DISTRICT JUDGE**
12
     **A P P E A R A N C E S:**
13
     RANDAZZA LEGAL GROUP PLLC
14   BY:  MARC RANDAZZA, ESQUIRE
     On behalf of the Plaintiff.
15
     DRUMMOND WOODSUM & MACMAHON
16   BY:  MELISSA A. HEWEY, ESQUIRE
             and
17        JEANA M. MCCORMICK, ESQUIRE
     On behalf of the Defendants, Brewer School Department, et al.
18
     PETRUCCELLI MARTIN & HADDOW LLP
19   BY:  JAMES B. HADDOW, ESQUIRE
     On behalf of the Defendant, Michelle MacDonald.
20
             Cathy J. Ford, Official Court Reporter
21                   cfordccr@gmail.com
                     609.367.2777
22
     Proceedings recorded by manual stenography; transcript
23   produced by computer-aided transcription.

24

25

1          THE DEPUTY COURT CLERK:  All rise.

2          The United States District Court is now in session.

3    The Honorable Lance Walker, presiding.

4          (Open court begins at 9:58 a.m.)

5          THE COURT:  Good morning, folks.  Have a seat.

6          We're on the record in Shawn McBreairty versus the

7    Brewer School Department.  This is Civil Case Number

8    24-cv-53-LEW.

9          I'll have counsel introduce themselves, please, for

10   the record.

11         MR. RANDAZZA:  Good morning, your Honor.

12         THE COURT:  Good morning.

13         MR. RANDAZZA:  Marc Randazza on behalf of Shawn

14   McBreairty and H.W.  With me is my paralegal, Cassidy Flavin.

15         THE COURT:  Good morning, folks.

16         MS. HEWEY:  Good morning, your Honor.  Melissa Hewey

17   and Jeana McCormick on behalf of the Brewer School Department,

18   Gregg Palmer, and Brent Slowikowski.

19         THE COURT:  Great.  Good morning.

20         MR. HADDOW:  And, your Honor, James Haddow for the

21   defendant Michelle MacDonald.

22         THE COURT:  Good morning.

23         MR. HADDOW:  Good morning, your Honor.

24         THE COURT:  All right.  Let's start with the

25   McBreairty case, Mr. Randazza, and I'll hear from you.

        1        MR. RANDAZZA:  Thank you, your Honor.  Do you prefer

        2   from the table or the podium?

        3        THE COURT:  Why don't you come up to the podium

        4   unless you need to be at the table for a reason.

        5        MR. RANDAZZA:  Good morning, your Honor.

        6        THE COURT:  Good morning.

        7        MR. RANDAZZA:  I'm happy we're starting with the

        8   McBreairty case because I think that is the easier decision

        9   here.

       10        I believe what we have here is, first, there's some

       11   question about standing, about whether there was a sufficient

       12   threat made that a reasonable person might succumb to that

       13   threat in sense of themselves.

       14        My friend -- and I use that term not just

       15   colloquially but truly -- Ms. Hewey has raised the -- has

       16   raised the defense here that it really wasn't that specific,

       17   and it's not specific enough for a pre-enforcement challenge.

       18        But I think what my friend gets wrong is that her

       19   citation to pre-enforcement challenge cases, all of them talk

       20   about -- all of those cases talk about when there's a rule

       21   passed and then somebody feels that that rule might be

       22   enforced against them, not a circumstance where there's

       23   actually a direct and palpable government threat of

       24   enforcement or other action.

       25        Now, it is true, if you look at that threat, it

doesn't specifically say what they're going to do.  It's just
a letter from a lawyer that says, "We are going to take
further action against you."

Brewer School Department then says, "Well, that might
have simply meant that we would write our own editorial about
you."

That's simply not credible.  You know, if you look at
it and you want to say this is too vague to interpret as a
threat, well, why isn't it vague enough to interpret as,
though, they'll burn down his house?

I think if you look at the extremes of absurdity, on
one end it's we're going to do something violent to you, and
on the other end, we're not really going to do anything except
send you another sternly worded letter.

Mr. McBreairty received a legal threat.  But not only
did -- I think in itself it creates enough standing.  But
contextually, given the relationship he has with the
government on these issues, we showed you in our papers,
prior, he was threatened similarly.

He did what he was told because he was afraid of
getting sued, and he didn't get sued.  The next time, he did.
This time, he's coming to this Court seeking your assistance.

THE COURT:  Let me ask you a question about the --
your challenging some of the cases, or many of the cases that
you've cited in your papers rely on plaintiff's challenging

1  the constitutionality of a criminal statute that may infringe

2  the First Amendment.  So how do the principles of standing

3  work in this admittedly different context?

4         MR. RANDAZZA:  I think the absence of a statute that

5  they're saying -- first of all, there isn't an absence of the

6  statute.  They are actually threatening in that letter to try

7  to enforce these -- I'll just call them the alphabet policies

8  because I can't remember the exact acronyms off the top of my

9  head.  But the alphabet policies here, which normally we might

10 look at and say that's just crazy, why would they ever try to

11 do that?

12        THE COURT:  Right.

13        MR. RANDAZZA:  Well, they have.  We're defending that

14 right now.  We're up in front of the Maine Supreme Court as

15 far as whether they can do that or not.

16        So this is not an ephemeral or simply, you know,

17 imaginary concern.  This particular person in this particular

18 context with this particular kind of action that has been

19 threatened here, he is under that.

20        So if it were a case of -- I understand that they're

21 arguing, well, what statute are we challenging?

22        Well, we're not challenging necessarily a statute.

23 We're challenging the government threat.

24        If the police showed up at my house and said they're

25 going to arrest me for nothing, I don't then say, "Well, I

1  guess I can't go to federal court over this because they

2  haven't actually cited a statute."

3          Here, we have both.  They're saying that because he

4  somehow violated this privacy law, they're going to do

5  something to him.  And it's something less than violently

6  attack him but certainly something more than simply voice

7  their displeasure.  It is government action that's going to be

8  threatened here.

9          So he has a right to prove punishment, seek redress

10 from the courts.  I don't think he has to simply wait to be

11 sued or wait to be -- I don't know what else.  But if we look

12 at the circle of probabilities of what that threat is supposed

13 to mean.

14         And perhaps it was just an empty threat.  Perhaps

15 they just hoped they could bully him into silence.  Well, that

16 would still be adverse government action even in the absence

17 of a criminal statute, but he could be violated.

18         But they did invoke the privacy statute, saying that

19 this may be in violation of that law, which I can certainly

20 address that if it's --

21         THE COURT:  The privacy statute invokes school

22 policies, which I'd like to ask you about as well.

23         MR. RANDAZZA:  Yeah.

24         THE COURT:  But as a thought experiment, I'm

25 wondering if you might be able to answer whether it would be

enough to satisfy standing if there was a relatively vague

allusion to further action if you don't do or demanding that

you do, we'll be compelled to take further action.

Is sort of a vague allusion, indefinite reference to,

presumably, civil litigation enough to grant your client

standing in that context?

MR. RANDAZZA:  Yes.  If that was all the threat was,

if we had all the other context gone, I would still say it is

sufficient.

If the government says, "Stop it or else" --

THE COURT:  Yeah.

MR. RANDAZZA:  -- I don't know that we need to have

a -- otherwise, what is -- what does the "or else" mean?  As

we said, if the school bully says, "Give me your lunch money

or else," do you ask, "Or else what?"

Well, you ask, "Or else what?" if you're not scared.

You're about my age.  You've been in a bar at some

point where somebody said something.  And you say, "Or else

what?" if you're not afraid.  This guy's afraid.  That's why

he censored himself.

THE COURT:  And what does the historical relationship

between Mr. McBreairty and Ms. Hewey and Ms. Hewey's law firm

add to the analysis, if anything?

MR. RANDAZZA:  I think it adds credibility to it.  So

if, you know, it -- imagine if, you know, you had somebody who

has the typical enforcer for some crime family shows up.

I mean, I'm sorry. That's probably an unflattering comparison.

THE COURT: I think Ms. Hewey thought it might be.

MR. RANDAZZA: I do apologize.

But I'll say when you have had this same weapon, we'll say, brandished against you and used against you -- brandished in 2021, actually used and drawn blood in 2022, in 2023, 2024 -- I think you have a very real reason to be afraid that you're going to wind up in another *Hermon* suit or something else.

I mean, the *Hermon* suit is quite creative. I do not know the limits of Ms. Hewey's creativity. I certainly have respect for them, and Mr. McBreairty does as well.

So to say that even in a vacuum but contextually, I think we have a looming threat here of adverse government action that he should not have to sit and wait until it hits him to come here seeking redress.

THE COURT: In the absence of a letter, if we take that out of the equation, does the -- or maybe not in its totality.

But if we just narrowed our focus as to the suggestion by the school that Mr. McBreairty was somehow in violation of those policies that were referenced by Ms. Hewey, how do you -- how does that affect the analysis?

1        MR. RANDAZZA:  That hypothetical, I think, would

2    change my beliefs about standing.  If simply the principal

3    called up and said, "Hey, Mr. McBreairty, I think you're

4    violating the school policies," that would be a closer call.

5        THE COURT:  Okay.

6        MR. RANDAZZA:  I think if he said, "You're violating

7    these school policies and we're going to call in Drummond

8    Woodsum," then I think we've tipped over into state -- into

9    clear standing grounds.

10       But I think even so, when the government calls you

11   and says you're violating a government policy or a statute, I

12   think you right then, immediately, have standing.

13       Now, I think if -- I think if we tilt the

14   hypothetical a little more and say, "What if the principal had

15   written an editorial about it?" I think then I wouldn't be

16   able to credibly claim standing.  I think then it would be

17   just some vague allusion.

18       THE COURT:  All right.

19       MR. RANDAZZA:  But this is a direct threat.

20       And also, remember, it has this -- I pointed out some

21   cases that talked about the immediacy and persistence.

22       So respond, "You better tell us you did this.  Not

23   just give us your position.  You better tell us you complied

24   within 24 hours.  You got 24 hours to comply."  And

25   follow-ups.  So persistence.

1          So in every event here, I think we are very far from

2    the fence on a lack of standing.

3          THE COURT:  All right.  Let's then move to merits.

4          The defendants argue that McBreairty is unlikely to

5    prevail on the First Amendment retaliation claim because

6    Attorney Hewey's email didn't actually -- didn't actually

7    chill his speech since he later published the content again

8    and spoke about the offending materials.

9          What's your response to that?

10         MR. RANDAZZA:  I do not find that credible as a legal

11   or a factual argument.

12         THE COURT:  Why?

13         MR. RANDAZZA:  Because if I threaten you to, you

14   know, give me that, and you give me that but you don't give me

15   everything, that doesn't mean that I haven't threatened you.

16         The fact that Mr. McBreairty got a specific threat,

17   this article, this content of this article -- now, I don't

18   know if he subsequently published it or not.  And if I'm

19   misremembering that, I apologize.  I believe they were

20   contemporaneously published, perhaps even all of them prior to

21   the threat.

22         But even so, you know, I really don't think that

23   that's the case.

24         But if you are told, "Take down the Pentagon Papers

25   article," and then you have other publications of similar

1  material somewhere else, I don't think that that says, well,

2  you weren't actually chilled.

3      THE COURT:  All right.  So if I understand the

4  argument correctly, once the constitutional violation has

5  occurred -- which, obviously, is Mr. McBreairty's claim by

6  virtue of the demand that he take down his article.  Once that

7  has occurred, the fortuity that he may have spoken on one or

8  more of the topics in the article later doesn't do anything to

9  mitigate the harm caused by the school in the first instance.

10      MR. RANDAZZA:  I don't believe so, no.

11      THE COURT:  All right.

12      MR. RANDAZZA:  He wants to publish this particular

13  article that stands as an exhibit in this case without the

14  government using any of its powers or any of its coercive

15  abilities to tell him that he has to either take it down

16  completely, which I know they deny --

17      THE COURT:  Yeah.

18      MR. RANDAZZA:  -- or you need to edit it.

19      The government doesn't get to call up the *Bangor*

20  *Daily News* and say, "We want you to change one comma in this

21  article," without violating First Amendment.  Let alone

22  saying, "Here are four points that we want changed in your

23  article or we're going to take further action, and you better

24  do it in the next 24 hours."

25      THE COURT:  Is your client's publication of the

photograph protected by the First Amendment?

MR. RANDAZZA:  Yes.

THE COURT:  And how so in light of -- so -- and I'm a little uncertain as to where the school is on this particular point.  We'll find out today.

How is that protected speech in light of Ms. Hewey's argument that it's -- it violates a criminal statute?

MR. RANDAZZA:  Well, I think we have to start from the proper starting line.  The presumption is everything is protected.  And then the government, in order to invoke powers to censor it, must show us how it is not.

Now, if the government says that this is -- let's assume for the sake of this argument that that photograph is absolutely created in violation of that statute.  And I do not concede that, and I can give you an entire treatise on why it isn't.

First of all, the statute says people have to have an expectation of privacy to whom privacy is -- you know, who are entitled to privacy.

The fact that it was taken in a bathroom does not mean that they have an entitlement to privacy.  It'd be different if it was in the stall, perhaps, but there's even cases that say otherwise.

If you're sitting in a stall with a big, wide gap and a police officer walks in and sees you doing cocaine in the

1 stall, they don't need a search warrant in order to go in

2 there and get to you.

3       So I don't think the statute itself does apply.

4 Nevertheless, let's, presume it does.  Just like in *Jean*,

5 where the First Circuit presumed that the law had been

6 violated in the creation of the video in *Jean*.  That's not

7 Mr. McBreairty's problem.

8       Now, we also have the fact that this photograph was

9 already circulating on social media at the time.  I believe

10 they've admitted that.

11       I know that Ms. MacDonald in her declaration at line

12 7 actually says, "Before the petition, there was a student who

13 took a photo of my child and other children in the girls'

14 bathroom and circulated that in the school, and it ended up

15 online."  Which is -- and then she says -- it's a violation of

16 their privacy.

17       So to say that Mr. McBreairty wouldn't have a right

18 to publish a news article with a photograph that was already

19 in circulation I think -- I just love this line from your

20 *Norris* case, you know, "Madison would recoil."  I think here

21 Madison would not just recoil, but he would weep.

22       How could we possibly say with any kind of

23 constitutional reference that a journalist who gets a copy of

24 a photograph can't publish it, period, much less one that had

25 already been published and widely circulated?  The First

1    Amendment protections for that article are bulletproof.

2         THE COURT:  I think the defendants are also arguing

3    that -- although this wasn't clear from the email from

4    Attorney Hewey to your client, but they're arguing that

5    Mr. McBreairty committed the tort of misappropriation of

6    likeness by publishing a photograph.  Does that affect your

7    merits analysis?

8         MR. RANDAZZA:  It does not.  They can say it's

9    misappropriation of likeness if, perhaps, Mr. McBreairty were

10   selling a tube of toothpaste with a picture on it.  It's not a

11   commercial use.

12        Now, I know they argue that because he doesn't write

13   voluntarily, he writes for pay, that that's a commercial use.

14        Such a ruling, I think, would invite amicus briefing

15   from every single publication in the country stating that, "We

16   are not going to be forced to become simply" -- I don't even

17   know what the -- we're going to impose socialism on every

18   publication that we're only going to do it out of the goodness

19   of our hearts.  Every single printing press in America would

20   have to shut down.

21        So it's -- I don't think it becomes misappropriation

22   of likeness simply because the person whose likeness it

23   is who -- we haven't heard from them at all.  But let's

24   presume that every person in that photograph does not want to

25   be in that photograph.  Presume that.  That's just too bad.

1    You know, it's -- I'm not without empathy.  But

2    constitutionally, it doesn't matter.

3            THE COURT:  Let me ask you about the precise nature

4    of the relief that Mr. McBreairty's seeking.

5            And, specifically, my question is:  If you're

6    likely -- if Mr. McBreairty is likely to succeed on the merits

7    of the First Amendment retaliation claim and therefore to

8    receive injunctive relief to that end, why is injunctive

9    relief concerning the schools policies necessary?

10           MR. RANDAZZA:  Because it is -- if he is permitted --

11   we want injunctive relief that he is permitted to publish this

12   article in its original form with neither threats nor coercion

13   nor action being taken against him by the government.

14           The government in this case has very credibly -- and

15   I think if you look at this -- if you look at that threat, you

16   know, I don't give a lot of credence to the after-the-fact

17   explanation that the school was simply saying those policies

18   apply to the school itself.

19           The text of the threat does not say that.  The text

20   of the threat says, "He's in violation."  This is a direct

21   duplicate of the *Hermon* case that he's fighting right now.

22           So, yes.  I am asking that the government be enjoined

23   from not only threatening him but attempting to bring that

24   civil action against him in order to try to enforce the

25   alphabet policies against him.

1    THE COURT:  Does the -- am I correct that the case

2    you referenced earlier that's currently in front of the Maine

3    law court, is that the *Hermon* school case?

4    MR. RANDAZZA:  Yes, your Honor.

5    THE COURT:  And does that involve a challenge to

6    whether the school's policies are applicable to

7    Mr. McBreairty?

8    MR. RANDAZZA:  Yes.  Mr. McBreairty in that case was

9    making statements at public meetings and making public records

10   requests.

11   The Hermon School District filed a lawsuit against

12   him seeking to take some of their alphabet policies, although

13   not all of them, just the ones that they felt he would be

14   violating if he were a student or a teacher and have those

15   converted into injunctive relief against him so that he would

16   go to jail if he violated them.

17   That is the crux of that case.  And it -- if it

18   sounds incredible to you, it sounds incredible to me.  But

19   that was first blood in McBreairty versus the education system

20   of Maine when he got sued for that.  So it is the precise same

21   thing.

22   THE COURT:  And where does that case stand presently?

23   Have you briefed to the law court or?

24   MR. RANDAZZA:  We have both briefed and argued it.

25   So --

1       THE COURT:  Okay.

2       MR. RANDAZZA:  -- any day now.

3       THE COURT:  When was the oral argument, roughly?

4       MR. RANDAZZA:  January.

5       MS. HEWEY:  Recently.

6       THE COURT:  Recently.  Okay.

7       MR. RANDAZZA:  Yes.

8       THE COURT:  All right.

9       MR. RANDAZZA:  But I don't think that -- your Honor,

10  I don't think this Court should defer to that.  Because the

11  question is not:  Does Maine law allow this to happen?  It's:

12  Would the First Amendment allow it?

13      Would the First Amendment really permit the

14  government to file a lawsuit against a citizen to enforce the

15  alphabet policies to force a publication to stop publishing

16  information on a matter of public concern and a photograph

17  that was being widely circulated already at that time?

18      THE COURT:  Understood.

19      Help me out on your theory of liability regarding

20  Ms. MacDonald.  I'm struggling with what that theory of

21  liability may be given the facts set forth in the verified

22  complaint.

23      I have less of a struggle with respect to the

24  companion case brought by H.W.  But tell me about your theory

25  of liability in Mr. McBreairty's case against Ms. MacDonald.

1      MR. RANDAZZA:  Well, when we look in the threat

2 letter -- if I'm not remembering it correctly -- it does

3 reference Ms. MacDonald.

4      If I'm wrong about that -- yes, it references

5 Ms. MacDonald.  She is acting on either the -- the threat is

6 either on her behalf with her authority or at least with her

7 apparent authority.

8      We don't necessarily -- if she wants to stand up

9 today or her counsel wants to stand up today and say, "We

10 disclaim that.  To whatever extent you might have thought that

11 that was acting on her authority, we disclaim that authority

12 and repudiate the threat on her behalf," then I think we're

13 fine.

14      But it specifically references that one of the

15 statements that has to come out of this article or the

16 government is going to take further action is one on behalf of

17 Ms. MacDonald.

18      So I -- I don't know that they did that simply as an

19 *ultra vires* act without Ms. MacDonald's permission, but

20 nowhere in this entire briefing do I see MacDonald saying,

21 "This wasn't on my behalf.  I don't want them to do it.  And

22 Mr. McBreairty can do whatever he likes consistent with the

23 First Amendment."

24      THE COURT:  So I'm wondering, in the absence of your

25 knowing it and the absence of my knowing it and the absence of

1   any testimony or other evidence to that effect, whether I'm

2   able to resolve that question on the papers.

3          And I ask that question for the purposes of this

4   discussion, but you're going to hear that question again as we

5   get to our second case of the morning.

6          And I'm wondering if the effect of that may be that

7   it's inappropriate, to the extent Ms. MacDonald is concerned,

8   to, at the very least, grant your motion for TRO and schedule

9   a testimonial hearing for the motion for preliminary

10  injunction to resolve factual disputes that can't be resolved

11  on the papers.  Which is historically what I've done in these

12  types of cases.

13         What do you have to say about that?

14         MR. RANDAZZA:  I think we can resolve that in this

15  case with little difficulty.  Any injunction you might issue

16  in this case that includes Ms. MacDonald I think should be

17  limited to her official capacity.

18         If Ms. MacDonald does believe as a private citizen

19  that she has a private cause of action against Mr. McBreairty,

20  I don't think it would be proper to enjoin that in the order

21  we're asking you for.

22         So if it wasn't, if it was something she did as a

23  government actor, as a school teacher she called up Drummond

24  Woodsum or asked them in some way or asked the school to ask

25  them, now she's acting in her official capacity.  This is not

1   on her behalf personally.  That's the only place we're looking

2   for shelter.  Only as a government employee.

3         THE COURT:  Why is -- this is my last question unless

4   you have more arguments, which may precipitate more questions.

5         But why is relief against the individual defendants

6   appropriate?  And by "individual defendants," of course, I'm

7   referring to Superintendent Palmer and the principal and

8   Ms. MacDonald.

9         You've touched on Ms. MacDonald.  Tell me why relief

10  against the individual defendants is appropriate.

11        MR. RANDAZZA:  These individual defendants, it seems,

12  were the prime movers for this action.  I don't believe that

13  Drummond Woodsum just did this on its own.  Somebody had to

14  take the action.

15        So they should be enjoined, again, in their official

16  capacities.  We may have claims against them in their personal

17  capacities but later on.  But the injunction, just seeking

18  against them in their official capacities.

19        So somebody has to be enjoined.  If the school system

20  is enjoined and we don't have these individuals who were part

21  of the decision-making process enjoined, we might have an end

22  run that they can do around it.

23        So, again, if any one of these people feel like they

24  have a personal defamation claim -- I mean, I would not advise

25  it.  But if they think they have one, I don't want this Court

 1   to tell them they don't have redress to the courts.  I just
 2   want the government told that.
 3           THE COURT:  Mr. Randazza, I'm happy to hear any other
 4   portions of your argument you wish to emphasize this morning.
 5           MR. RANDAZZA:  Your Honor, if you have no further
 6   questions of me, I will yield to my friends.
 7           THE COURT:  Thank you.
 8           MR. RANDAZZA:  Thank you, your Honor.
 9           MS. HEWEY:  Good morning, your Honor.
10           THE COURT:  Good morning.
11           MS. HEWEY:  I guess I want to start, as opposing
12   counsel did, with the standing issue.
13           THE COURT:  Yeah.
14           MS. HEWEY:  And I have really, I guess, two points to
15   make there.
16           Putting aside the fact that opposing counsel doesn't
17   appreciate sarcasm, I think that their point here is that this
18   was, and we just heard, a "looming threat."  That is how it
19   was characterized to the Court by counsel for the plaintiff.
20           I would point the Court to *Blum versus Holder*, where
21   the First Circuit made it clear that the appropriate standard
22   for standing in a pre-enforcement case is "certainly impending
23   threat."
24           So a looming threat does not meet that standard, and
25   I think that means right out of the box that there is no

1  standing in this case.

2      The second point I want to make -- and I have to

3  admit that, your Honor, you, a little bit, took the wind out

4  of my sails here.

5      THE COURT:  Sorry.

6      MS. HEWEY:  That's all right.  You get to do that.

7      -- is that I think we need to be very careful in this

8  case to separate, when we're talking about pre-enforcement

9  First Amendment cases, to separate cases that are challenging

10 the constitutionality of the statute from cases that are First

11 Amendment retaliation cases.

12     So I think that all of the cases that plaintiff cited

13 in support of their argument that they have standing are

14 actually pre-enforcement cases challenging the

15 constitutionality of a statute, where the government is saying

16 if you don't do X or if you do X or if you don't stop talking,

17 we're going to enforce this criminal statute, generally.  I

18 guess in *Bantam Books* it wasn't entirely criminal, but it had

19 some criminal overlay.  We're going to enforce this against

20 you.

21     That isn't this case because there is no threat.

22 There is no ability of the Brewer School Department to enforce

23 anything against Mr. McBreairty.

24     And so here I just want to step back for a minute and

25 talk a little bit about the policies, the school board

policies that there have been some questions about and I am

realizing that I have not been clear about.

So let me try to be clear. These are school board

policies. They apply -- the school can apply those policies

to no one that is not associated with the school.

The theory here and, frankly, the theory in the

*Hermon* case -- even though I think that that's irrelevant to

this case, and I'll tell you about that in a minute -- is that

all of those policies impose upon the school department and --

the obligation to protect their employees and their students

from certain things, specifically bullying and harassment.

So if a student or an employee is bullied, harassed,

or hazed, also, by somebody within the school, the school has

the ability to address that as a matter of course.

But if it's a third person -- party like

Mr. McBreairty, there's nothing that the school can do without

reaching out to the judicial system and saying, "Please tell

him to stop." That's what the *Hermon* case was about.

THE COURT: "Please tell him" -- I'm sorry. I just

want to understand.

"Please tell him to stop."

And any good Court might ask in response, "What

authority do I have to tell him to stop."

And are you saying that the school policies -- or one

or more of the school policies gives the Court the authority

```
 1  to --

 2          MS. HEWEY:  No.

 3          THE COURT:  Okay.

 4          MS. HEWEY:  The school -- the theory in the *Hermon*

 5  case is that the school policies give the school department

 6  standing to bring a claim that is almost very close to being

 7  on behalf of somebody else.

 8          So he's calling a -- a Hermon School Department

 9  teacher a groomer and engaged in sexual misconduct, which is

10  false, on the internet.

11          So the Brewer School Department -- and she says --

12  she files a formal bullying complaint and says, "You need to

13  protect me."

14          Brewer can't do anything, so they go to the Court and

15  say, "We have this obligation.  We would like you to enjoin

16  her from speaking."  So that was the complaint, which you

17  have.

18          The next thing that happened was that he filed, and

19  he could have done here, an anti-SLAPP motion, motion to

20  dismiss.  That's the thing that's up before the law court.  In

21  other words, telling -- asking him not to say this, is that a

22  violation of the anti-SLAPP motion.

23          THE COURT:  Right.

24          MS. HEWEY:  The other issues are not before the law

25  court at this point.  I will tell you that during argument
```

1  there was some justices that expressed some questioning about

2  whether the school actually has standing to bring that claim.

3  That's for another day.  That isn't what we're

4  talking about here.

5  The only thing we're talking about here is that

6  when -- when this was published and these very specific parts

7  of the article -- no one told him to remove the whole article.

8  Just certain parts of the article that the Brewer School

9  Department felt that it had the obligation to try to address

10  with this outside person under those policies and under the

11  state law that also requires that they protect students and

12  teachers from bullying, harassment and hazing.

13  So that's all we're talking about.  This is not --

14  nobody is trying to enforce those policies against him.

15  So his only claim here is a First Amendment

16  retaliation claim.  And there, the standard, if there's going

17  to be a threat -- and I'm not sure I've seen any First

18  Amendment retaliation claims where standing sort of relies on

19  a threat.

20  But if it were to, I think you're in the *Blum versus*

21  *Holder* standard of it, it being a certainly impending threat.

22  Here, the Brewer School Department has no power, no

23  authority to do anything other than to go to a court.  They

24  have a First Amendment right to go to a court.  And if their

25  lawsuit is frivolous, if it isn't -- if there is no basis for

1    it, the courts have, in the context of that lawsuit, a way to
2    deal with it.
3          So I just don't see that there's standing here.
4          THE COURT:  So, okay.  Let me -- a couple of
5    questions on that point.
6          So I think what you're arguing is that the -- that
7    the failing -- Mr. McBreairty's failing in demonstrating
8    standing really turns on this idea that he has to -- a threat
9    of civil litigation, of going to the courts and asking the --
10   the school going to the courts, the school, obviously, can't
11   force anything on its own with respect to Mr. McBreairty, but
12   they can petition the courts for assistance to tell
13   Mr. McBreairty stop --
14         MS. HEWEY:  Yeah.
15         THE COURT:  -- stop doing what you're doing.
16         Are you saying that in pre-enforcement actions, the
17   possibility of the threat of litigation or the actual threat
18   of litigation, the threat of going to the courts and asking
19   for help, that's not enough to vest standing?
20         MS. HEWEY:  So I think that's true in the First
21   Amendment retaliation arena.
22         THE COURT:  So when does -- so I'm just curious.
23         So the First Amendment -- in the First Amendment
24   context, does a plaintiff need to wait for the whole bloom of
25   the threat to be manifest by way of an enforcement action,

whether it's civil or criminal prosecution or something like
that?

        And then Mr. McBreairty, for example, can have his
day in court?  If he's on the other side of the caption, if
he's a defendant and Brewer School Department has sued him,
that's when he has standing to raise a First Amendment
retaliation claim, but not before?

        MS. HEWEY:  Yes.  And he has the full force of the
anti-SLAPP law that allows that to be done quickly, that has
fee shifting and all of those things.

        That's a whole different sort of animal than a
pre-enforcement case where it is the government seeking to
impose a usually criminal law on somebody.

        Because here it is the very person that's trying to
quiet the speech who is imposing the law.  And that's a very
different thing than here, where we're both on the same -- the
Brewer School Department on one side and the -- McBreairty on
the other side and the same footing when they get -- if they
were to get to a court on some sort of lawsuit that the school
department might bring.

        THE COURT:  All right.  So let me sort of try to tie
this to what we have so far in the pleadings.

        So the email from the school department demanded that
McBreairty remove certain content from his post within a day
"or we will be forced to take further action against you."

1          Does that language, considering the fact that it came

2     from an attorney on behalf of her client, constitute a threat

3     of litigation?

4          MS. HEWEY:  I don't think it does.  And I think --

5          THE COURT:  Okay.  Tell me why.

6          MS. HEWEY:  And I think that -- and this is -- I

7     don't have any case law on this issue.  But I think as a

8     practical matter, lawyers write letters all the time that say,

9     "Take this down.  Apologize.  Do this, do that, or we'll be

10    forced to take further action."

11         THE COURT:  Sure.

12         MS. HEWEY:  And what they mean is they're hoping it

13    will happen, and then we're going to assess what, if anything,

14    we can do.

15         So I don't think that this is an immediate threat.  I

16    think this is saying sort of, "We really, really mean it."

17         THE COURT:  All right.  And I don't want to get too

18    far in the weeds here, but I'm just -- your answer left open

19    the possibility that the school board may have simply wished

20    to have another moment to roundtable the issue, soberly

21    evaluated whether they would do anything if he failed to take

22    down his publication.

23         But the email demanded that Mr. McBreairty remove

24    certain content or "we will be forced to take further action

25    against you."  Not "forced to have a salon-type meeting of the

     1   minds and a philosophical discussion about the wisdom of

     2   taking action against Mr. McBreairty."

     3          So I'm just trying to inch this along to the

     4   practical implication of the email.  Does that change your

     5   mind?  Does that constitute a threat of litigation?

     6          MS. HEWEY:  It doesn't.  And particularly given the

     7   First Circuit requirement that this be an impending threat.

     8          So it's not -- it doesn't get there.  That's --

     9          THE COURT:  And -- yeah.

    10          MS. HEWEY:  And I will say -- I mean, I think that

    11   opposing counsel touched on it a little bit in his argument.

    12          And that is that it's not just the school department

    13   here.  There are kids --

    14          THE COURT:  Sure.

    15          MS. HEWEY:  -- and there are employees.  And nobody's

    16   going to go running into court until and unless everybody is

    17   comfortable with that.

    18          And I will note, too, with -- when we're talking

    19   practically about the picture in the bathroom, that's not one

    20   child.  That's four different children --

    21          THE COURT:  Understood.

    22          MS. HEWEY:  -- whose privacy was invaded.

    23          THE COURT:  All right.  So -- all right.  So I want

    24   to be sure that I understand.

    25          So just -- we don't even get out of the box as to --

1    we're talking about two different things here with respect to

2    the element of standing.  One of those things is:  Is there a

3    threat of litigation?

4            And I agree with you that as a practical matter, the

5    case law tends to tilt heavily toward circumstances in which

6    there's a criminal statute -- the threat of a criminal statute

7    being enforced which someone claims may impinge their First

8    Amendment rights.

9            But, as you know, in the First Amendment context, a

10   pre-enforcement threat of civil litigation can vest standing.

11           So what I'm trying to understand step by step here is

12   the email that you sent to -- on behalf of the Brewer School

13   Department to Mr. McBreairty -- let's leave out qualifying

14   words like "looming" and "pending," Sword of Damocles.  How

15   close are we to actually executing the threat?

16           Does that language constitute a threat of enforcement

17   by way of a lawsuit given the historical travel of the

18   relationship between you and your law firm and Mr. McBreairty?

19           MS. HEWEY:  So I don't think that it is a threat.

20           THE COURT:  Okay.

21           MS. HEWEY:  It is true that Mr. McBreairty takes a

22   position that is adverse to a number of school districts in

23   the state --

24           THE COURT:  Right.

25           MS. HEWEY:  -- and that Drummond Woodsum represents a

1    number of school districts in the state.

2              THE COURT:  Right.

3              MS. HEWEY:  But every client and every case is

4    different.  This is not a personal vendetta.

5              In that regard, I would note that in the *Doe versus*

6    *RSU 26* case, I was on the other side of the issue.  So --

7              THE COURT:  Sure.

8              MS. HEWEY:  -- being a lawyer means representing your

9    client.  And I don't think that this Mafia thing really -- as

10   much as I did kind of enjoy it, it doesn't really work.

11             So, I mean, just getting back to the issue here --

12   and I do again want to encourage the Court, when you're

13   looking at these threats of litigation, to look at who's

14   making the threat and what type of threat they're making.

15             Because it's in every case that's been cited, they're

16   making a threat to base the litigation on an unconstitutional

17   statute or rule.  That's a lot different than saying, "We

18   don't think what you're doing is right, and we're going to go

19   to a court and ask if it is right."  That is not a threat.

20             THE COURT:  Well, that's just -- so that -- I

21   understand the distinction you're trying to draw.  I'm

22   wondering if it's meaningful or if the case law says it's

23   meaningful.

24             What you're talking about is the proximate mechanism

25   to enforce the desire to have the speech taken down, let's

1   say.  In other words, you're talking about the mechanism of a

2   statute which would require that the speech be taken down

3   because it's criminal or whatever.

4         Is the threat of civil litigation to effect the same

5   result, to get the speech taken down and therefore to chill

6   the speech in the first instance, enough to constitute a

7   threat for purposes of standing?

8         MS. HEWEY:  I have found no case that says that is

9   enough.  I will acknowledge that that does not mean that there

10  is no case, but I don't think there is.

11        THE COURT:  Okay.  And if the first email -- and I

12  understand that you don't consider the email a threat.

13        But if I conclude that the first email is read as

14  threatening litigation unless Mr. McBreairty removed the

15  identified content from his post, does Mr. McBreairty then

16  have standing?

17        MS. HEWEY:  And as I've said before, I don't think it

18  does because I don't think that that threat is enough except

19  in a challenge of a statute.

20        THE COURT:  So let's talk about the school policies,

21  then, as it relates to standing.

22        The email said that certain portions of the article

23  have -- let me make sure I get this right -- have the effect

24  of bullying and hazing a student and a teacher at the Brewer

25  High School in violation of board policies ACAD, ACAF, and

1   JICK and Maine law.

2           And the email also references that the post has

3   caused Brewer High School and staff members severe distress

4   within the meaning of 20-A, MRS Sections 6553 and 6554.

5           Do the references to the school -- the board policies

6   and related Maine statutes threaten that they may be enforced

7   against Mr. McBreairty?

8           MS. HEWEY:  No, they don't.  And they don't for two

9   reasons.  One is the plain language of the email says these --

10  the inappropriate postings have the effect of bullying and

11  hazing a student and a teacher in violation of the statutes.

12          So what it's saying there is that that conduct

13  constitutes bullying and hazing, thereby kicking in the school

14  department's obligation to address it.  That's all it's

15  saying.

16          And I said two things, but the other one has left me.

17          THE COURT:  All right.  If you remember it, you can

18  tell me.

19          MS. HEWEY:  Okay.

20          THE COURT:  I don't want to get bogged down too much

21  in what the SJC is wrestling with at the moment in terms of

22  standing.

23          But what do you suppose the Brewer School Department

24  would have by way of jurisdiction over Mr. McBreairty

25  whatsoever in terms of imposing -- I think you said they don't

1    have -- they can't impose the school policy -- the board

2    policies over Mr. McBreairty.  True?

3            MS. HEWEY:  That's exactly right.

4            THE COURT:  Okay.

5            MS. HEWEY:  And that's one of the reasons that I

6    don't think they have standing.

7            This is a school department.  And when we keep

8    talking about them as if they're -- I mean, they are a

9    governmental entity.  But they're not the government.

10           It's the Brewer School Department.  He doesn't live

11   in Brewer.  He doesn't have kids in Brewer.  He doesn't work

12   in Brewer.  That's all they have.  They have no more power

13   over Mr. McBreairty than Gavin Newsom does.

14           And I think that that's important because that means

15   that there cannot be the threat that we've heard so much

16   about.

17           THE COURT:  So a general threat of "may be compelled

18   to take further action" coming from -- and I'm not picking on

19   you or your law firm, just the historical context of your law

20   firm representing schools with which Mr. McBreairty has had

21   legal complications.  That doesn't do it in terms of

22   demonstrating an imminent threat?

23           MS. HEWEY:  It doesn't.  And it clearly does not

24   chill his speech, as we've shown in our opposition.

25           THE COURT:  So let's get to that.  So let's talk

1  about the merits.

2       Let me ask if the email threatening litigation, does

3  that email then amount to adverse action for purposes of the

4  First Amendment retaliation claim?

5       MS. HEWEY:  So those are two very similar --

6       THE COURT:  Yeah.

7       MS. HEWEY:  -- concepts.  Although I think, as we

8  pointed out in our brief, there are additional reasons why

9  that's not adverse action, i.e., that the school department or

10  anybody has a First Amendment right to bring a lawsuit if they

11  feel like they've been wronged.  That's sort of the right way

12  to do things rather than take things into your own hands.

13       And also, as we pointed out cases that established

14  that the school department itself has a First Amendment right

15  to say, "Take that down.  That's inappropriate."

16       So we don't think that doing what you have a right to

17  do and no more could possibly be adverse action.  There has

18  been no adverse action here.  And I, frankly, can't see how

19  the school department could take adverse action against

20  Mr. McBreairty.

21       THE COURT:  All right.  So you're -- when you say you

22  can't see how the school department can take adverse action,

23  you're saying because they can't prosecute Mr. McBreairty for

24  a violation of the criminal code directly, all they can do is,

25  at most, sue him in civil action.

1    But suing him in civil action or threatening him to

2 do so does not constitute enough of an adverse action to give

3 him a retaliation claim on the First Amendment?

4    MS. HEWEY:  Not only does it not constitute enough,

5 but they have a right to do that.  You have a right to go to

6 the Court and say, "We have a dispute here, Court.  Tell us

7 who's right."

8    If you didn't have that right and you just had to sit

9 back and never know, that doesn't make any sense.  In our

10 society, if you have a dispute, you can't solve it by

11 yourself, you go to the Court and the Court tells you which

12 side is right.

13    THE COURT:  But you're talking about the procedural

14 order by which this dispute between Mr. McBreairty and the

15 school department could have hypothetically unfolded as

16 opposed to how it unfolded, and I'm wondering if that makes

17 any difference.

18    So, in other words, in your example, you're right,

19 obviously.  If the school department has a right to -- if they

20 wanted to, they could have sued Mr. McBreairty.

21    But I would expect that in such a case, that wouldn't

22 have simply done away with Mr. McBreairty's First Amendment

23 retaliation claim.  He probably would have counterclaimed for

24 a retaliation claim.

25    MS. HEWEY:  Exactly.

1        THE COURT:  So --

2        MS. HEWEY:  And I don't think -- I think instead

3   of -- I think what the Court would have done, then, is dismiss

4   that counterclaim and said, "If you challenge what the school

5   department has done, then it's an anti-SLAPP -- your remedy

6   goes through the anti-SLAPP law."

7        And, importantly, the anti-slap law kicks in after

8   the lawsuit has been filed, after you know whether -- after

9   you know what the claims are.  I don't see how this Court can

10  enjoin any lawsuit without knowing what the theories are.

11       THE COURT:  All right.

12       MS. HEWEY:  I think it's not ripe, at the least.

13       THE COURT:  So you argue that Mr. McBreairty's speech

14  was not chilled because he continued to publish and talk about

15  the offending material.  But were Mr. McBreairty's subsequent

16  activities outside the scope of the email demand?

17       MS. HEWEY:  So I'm not sure I understand your

18  question.  If you're saying was he doing things that were

19  different from what was published --

20       THE COURT:  Right.

21       MS. HEWEY:  -- in there?  I think that --

22       THE COURT:  Or -- or -- not things that were

23  published in there but, more specifically, the offending

24  portions that the email demanded he take down.

25       MS. HEWEY:  So I think that we provided the Court

1   with a link to a podcast where the picture of the student was

2   shown and where the -- I think the language -- and I'm not

3   sure whether it was printed or just spoken about the student

4   being a sexual -- engaging in sexual misconduct was also

5   republished.

6           THE COURT:  Okay.

7           MS. HEWEY:  I don't know that anything concerning

8   Ms. MacDonald's student was.

9           THE COURT:  Okay.  The language that you quoted from

10  *Nelson versus Maine Times* discusses appropriation of another's

11  likeness.

12          I just wanted to know.  Is that -- so that was the

13  confusion that I was alluding to to Mr. Randazza.

14          Is that the tort that the defendant is relying on --

15          MS. HEWEY:  The tort we're relying on is invasion of

16  privacy, and there are different levels of invasion of

17  privacy.

18          I'm not saying that misappropriation of likeness

19  doesn't apply.  I think more likely the public disclosure of

20  private facts is -- is more on point here.

21          THE COURT:  Okay.  And the argument, I take it, is

22  that whatever species of invasion of privacy you're relying

23  on, and you're contending that Mr. McBreairty's use of the

24  photo app, at least, is tortious and therefore not

25  constitutionally protected.  Could you just elaborate a bit

1  for me about that argument.

2          MS. HEWEY:  Yes.  So I think that it's pretty clear

3  that defamatory language and language that is otherwise

4  wrongful and tortious is not subject to at least as much

5  constitutional protection.

6          And so putting aside the defamatory conduct, what our

7  theory is on the invasion of privacy conduct is that we have a

8  statute that makes it pretty clear that things like this are

9  an invasion of privacy.

10         And I know that there was an argument previously that

11 taking a photo of children in a bathroom is not an invasion of

12 privacy.

13         I just will tell the Court that I, frankly, disagree.

14         This is a school.  These are students.  They're in

15 the bathroom.  They have an expectation of privacy.  When

16 parents send their kids to school, they expect that their kids

17 are going to be -- have a private bathroom.

18         THE COURT:  Is there evid -- because I may have

19 missed it -- is there evidence so far on the record that

20 Mr. McBreairty took that photograph?

21         MS. HEWEY:  No.

22         THE COURT:  Okay.

23         MS. HEWEY:  And I think everybody acknowledges that

24 it is highly unlikely that he took the photograph.

25         THE COURT:  Right.

1    MS. HEWEY:  So that's where we start going down the

2  rabbit hole of the legality.

3    THE COURT:  Right.

4    MS. HEWEY:  And in that case, what -- what plaintiff

5  focuses on is:  It's okay to use an illegally --

6    THE COURT:  Right.

7    MS. HEWEY:  -- and what we focus on is something a

8  little bit different, which is:  It's not okay to use a

9  photograph of children in a bathroom.

10    The cases that plaintiff cites, like the Pentagon

11  Papers and some of the others all -- the *Jean* case, they all

12  talk about publishing a matter of public concern.

13    Seeing children in a bathroom, it is the Brewer

14  School Department's position, is not a matter of public

15  concern.

16    THE COURT:  Right.

17    MS. HEWEY:  It's a matter of extreme privacy.  And

18  that's the basis of our claim.

19    THE COURT:  Sure.  In the broader context, do you --

20  you got to my next point before I did.  So that's exactly

21  where I wanted to go next.

22    Do all of the portions of Mr. McBreairty's article

23  involve a matter of public concern?

24    MS. HEWEY:  So -- and I'm going to try -- I think I

25  understand what your question is.

1     There is a lot in that article --

2     THE COURT:  Yeah.

3     MS. HEWEY:  -- that involves a matter of public

4  concern and that he has a right to speak.  I do not -- and

5  I -- but I do not think, for example, a picture of students in

6  the bathroom is a matter of public concern under any analysis.

7     THE COURT:  Well, one of those students, presumably,

8  was the student who is -- identifies as a girl, correct?

9     MS. HEWEY:  One is gender expansive, yes.

10     THE COURT:  Okay.  So because of that identification,

11  that person uses that bathroom, and that was -- the larger

12  context, I guess is what I'm trying to get at, of the article

13  is this policy dispute over whether Hermon ought to have this

14  policy or not and whether bathrooms ought to be assigned on

15  the basis of biological sex and not anything else.

16     And I think you -- I think the department correctly

17  has conceded that point insofar as it goes.

18     So some of his article is a matter of public concern.

19  That's a debate.  However one feels about those sides of the

20  debate, it's a debate and it's a matter of public concern.

21     So now I think what we're just talking about when

22  we're talking about the contested portions of the article is.

23  Are they proximate enough to the public concern part of the

24  debate to enjoy speech protection.

25     And you're telling me that the photographs of the

```
 1   students in the bathroom are outside of a matter of public
 2   concern.  Is that because that constitutes tortious conduct?
 3           I'd like to confine at least this part of the
 4   discussion to is that close enough to the purpose of the
 5   article, meaning the policy debate that's happening underneath
 6   all of this First Amendment challenge.
 7           MS. HEWEY:  So, partially.
 8           THE COURT:  Yeah.
 9           MS. HEWEY:  Because I want to be precise here.
10           THE COURT:  Yeah.
11           MS. HEWEY:  Part of it is because it's an invasion of
12   privacy.  But going beyond that to what I think the Court is
13   getting at is putting -- you're asking me to put that aside
14   for a moment.
15           THE COURT:  Yeah.  Yeah.
16           MS. HEWEY:  And I will do that.
17           I do not think that the individuals in a bathroom are
18   a matter of public concern.  The issue is:  Are -- should we
19   divide the bathrooms by biology.
20           THE COURT:  Wasn't Mr. McBreairty trying to support
21   his policy argument by saying, "This is really -- this is
22   really going on, isn't this awful, and these are reasons why
23   the school department ought to change its policies and here's
24   evidence of it"?  Here's evidence of it.
25           MS. HEWEY:  That is not -- that picture is not
```

1  evidence of anything.  It's evidence of four students in the

2  bathroom.  That's it.

3        It doesn't prove or disprove who's using the bath --

4  what the biological sex of anybody at Brewer is using the

5  bathroom.  It just absolutely has nothing -- it does not move

6  the debate forward, backwards or sideways.

7        It's a picture of kids in the bathroom.  That is not

8  a matter of public concern.  And, I mean, I think it's really

9  important that we understand these are kids.  This is a

10 school.

11        The issues are important.  But bringing it down to

12 the individuals and putting their pictures on the internet,

13 that doesn't add to anything.  And, even though I promised I

14 would try to keep that out, it is an invasion of privacy.

15        THE COURT:  Okay.  Does the school concede that

16 Mr. McBreairty is a media defendant?

17        MS. HEWEY:  No.

18        THE COURT:  Okay.

19        MS. HEWEY:  And I don't think -- and we didn't

20 address that in the briefing.

21        THE COURT:  Yeah.

22        MS. HEWEY:  Because I don't think that it is actually

23 alleged or in the complaint or briefed in their brief.  They

24 say he's a journalist, but they do not say he's a media

25 defendant.  I can speak to that issue, if you'd like me to.

         1    THE COURT:  Yeah.  Would you?  So do you think --

         2    MS. HEWEY:  Rather than you having us ask for further

         3    briefing?

         4    THE COURT:  Yeah.  I don't want any further briefing.

         5    MS. HEWEY:  Good.

         6    THE COURT:  I've asked for too much already.

         7    Let me ask you first, though, before you talk about

         8    the substance of what that means to your analysis if we do

         9    conclude or I conclude that Mr. McBreairty is a media

        10    defendant, why do you -- why do you think that there is a

        11    relevant distinction between a pleading that says he's a

        12    journalist and using the magic words "media defendant"?

        13    MS. HEWEY:  I don't think there is for the purpose --

        14    THE COURT:  Okay.

        15    MS. HEWEY:  -- of the -- of what the Court is looking

        16    at now.

        17    THE COURT:  Okay.  Okay.

        18    MS. HEWEY:  I think later on down the road, if we go

        19    to the issue of damages and --

        20    THE COURT:  Sure.

        21    MS. HEWEY:  -- liability, that that might be an

        22    issue.

        23    THE COURT:  Fair enough.  Okay.

        24    So now let's talk about how that affects the school's

        25    argument if we conclude that -- at least for the purposes of

```
 1   where we are in the proceedings now, that Mr. McBreairty is a
 2   media defendant.
 3        MS. HEWEY:  So, are you asking me to --
 4        THE COURT:  Let's assume that I conclude that
 5   Mr. McBreairty is a media defendant and let's also assume that
 6   I conclude that his article involved matters of public
 7   concern.
 8        Would the school agree that his speech is therefore
 9   protected unless the defendants meet their burden in proving
10   that his statements were false?
11        MS. HEWEY:  False or malice, there's -- I'm not
12   entirely certain of all of the -- there is a higher standard
13   for media defendants.  And we would need to prove falsity or
14   that it was published with malice, et cetera, yes.
15        THE COURT:  So have -- okay.  So let's stay with our
16   hypothetical premise to the question.
17        Have the statements about H.D., which arguably imply
18   that H.D. committed a sexual assault, have those statements,
19   right now, in the preliminary stages, been proven false on the
20   papers?
21        MS. HEWEY:  Well, there is certainly a -- so using
22   the standard of proof that the Court is faced with --
23        THE COURT:  Yeah.
24        MS. HEWEY:  -- more likely than not, I think that we
25   have proven them false.  Because I think you have Gregg
```

1  Palmer's declaration, and all you have from Mr. McBreairty and

2  H.W. is that they heard from somebody else that this might

3  have happened.

4       THE COURT:  Which is reflective of what was said in

5  his publication.  So, I'm trying to track what he says in his

6  publication that the offend -- what the school department

7  finds is part of the offending language and how that matches

8  up with the defendant's burden of proving those statements

9  false.

10       So, Palmer acknowledges -- Superintendent Palmer

11  acknowledges that there was an accusation, accusation of

12  sexual assault against H.D.

13       MS. HEWEY:  Not sexual assault.  There's a difference

14  between touching and sexual assault.

15       THE COURT:  So he investigated sexual touching

16  against H.D.

17       MS. HEWEY:  I think he just said "touching."

18       THE COURT:  Okay.  But that it was found to be

19  without merit.

20       MS. HEWEY:  Yes.

21       THE COURT:  All right.  So, on the other hand, if

22  McBreairty had provided evidence -- has provided evidence that

23  people have accused H.D. of sexual assault -- which is what he

24  basically says in his -- in his article.

25       So, in light of that conflicting evidence -- this

1   gets back to my original question.  So we have conflicting

2   evidence.  Does McBreairty prevail, at least for now, as to

3   those statements since the burden is on the defendants to

4   prove the statements to be false?

5          It doesn't foreclose, obviously, the defendants down

6   the road, at a preliminary injunction hearing, if we have one,

7   that involves testimony or hearing on the merits or

8   consolidated hearing on both, from putting on evidence that

9   those statements were false.

10          But for now does that conflicting evidence on the

11  paper mean that the defendants have failed to prove that the

12  statements are false?

13          MS. HEWEY:  To prove that that particular statement

14  is defamatory.  Is that what you're asking me?

15          THE COURT:  Correct.

16          MS. HEWEY:  I -- I -- again, I don't think so.

17  Because I think that what Mr. McBreairty has said is that

18  somebody -- people have claimed that this person engaged in

19  sexual assault.  That's all he says.  But it clearly implies

20  undisclosed defamatory facts.

21          On the other hand, what the superintendent has said

22  is, "We have looked into it and we have found, we have -- we

23  have determined that that's not true."

24          So I would contend, and the Court may disagree with

25  me, that if you put that on the scale, there's a tip -- ever

```
 1   so slightly, I would acknowledge -- towards --

 2            THE COURT:  The school.

 3            MS. HEWEY:  -- in favor of the school department.

 4            THE COURT:  All right.  And, finally -- at least as

 5   far as I'm concerned.  But you're welcome, Ms. Hewey, to point

 6   me to any particular part of your argument that you think

 7   deserves special attention.

 8            I want to just ask you about the statement regarding

 9   Ms. MacDonald and her child "who pretends to be a boy."  You

10   argue that statement is false, so we're still in the realm of

11   the burden is on the school to demonstrate that that statement

12   is defamatory.

13            Is that a -- tell me how that statement is false.  Is

14   that a characterization or is that something that is

15   susceptible to being proven false?  Because I'm forecasting

16   that Mr. McBreairty is going to say, "That's my opinion.

17   That's how I characterize transgender."

18            MS. HEWEY:  So I can imagine that if we go all the

19   way to trial in this case that that would be a subject of

20   expert testimony --

21            THE COURT:  Right.

22            MS. HEWEY:  -- about how if you identify with a

23   gender that that's genuine and it's not pretending.  And I

24   could imagine that we would also have expert testimony saying

25   that this person genuinely identifies as something different
```

 1   than their biological --

 2           THE COURT:  Right.

 3           MS. HEWEY:  -- sex.

 4           So I don't think, ultimately, that that is a matter

 5   of opinion.  I think it's a matter of fact.

 6           THE COURT:  Right.  Fair enough.

 7           MS. HEWEY:  I also think that it's, again, an

 8   invasion of privacy.  And I don't think that he has any First

 9   Amendment right to say those basically unkind, unnecessary

10   statements about a student.

11           THE COURT:  Okay.  Fair enough.

12           So you say "ultimately."  And I agree that I could

13   see a trial playing out just as you've described it on that

14   point.  But we're not at "ultimately" today.  So what do I do

15   today on the motion for TRO?

16           MS. HEWEY:  So, first off --

17           THE COURT:  Yeah.

18           MS. HEWEY:  -- I think that there are a number of

19   reasons for you to deny the TRO.

20           To the extent that the Court is going to grant a TRO

21   because it does not feel that that particular language -- or

22   it feels that that particular language is protected by the

23   First Amendment, then I suppose that the order would say that

24   they have the right to publish that.

25           But I want to just drill down on that because in

1  order to even make that order, then -- and I don't want to

2  reprise what I said before, but I don't know how the Court

3  gets there.  Do you say, "You, Brewer, cannot bring a

4  lawsuit"?

5          THE COURT:  Don't know how I get there as far as

6  fashioning a relief?

7          MS. HEWEY:  Yes.

8          THE COURT:  Okay.  Yeah.

9          MS. HEWEY:  "You, Brewer, cannot bring a lawsuit"?  I

10 don't think that the Court can do that because you don't know

11 what lawsuit the Court -- what lawsuit would be brought.

12         What they want, essentially, is a declaration that he

13 has the right to do this.  That is not -- not appropriate at

14 this stage.

15         And you can't fashion -- I don't -- they didn't ask

16 for specific relief --

17         THE COURT:  You think that constitutes an advisory

18 opinion if I --

19         MS. HEWEY:  Yes.

20         THE COURT:  -- just issue the relief that they're

21 seeking.

22         MS. HEWEY:  Exactly.  They didn't ask for a precise

23 relief.  And I think the reason they didn't ask for a precise

24 relief is because there's no precise relief that the Court can

25 grant.

```
 1            THE COURT:  Thank you.

 2            MS. HEWEY:  Thank you.

 3            MR. HADDOW:  Good morning, your Honor.

 4            THE COURT:  Good morning.

 5            MR. HADDOW:  As you know, I represent Michelle

 6   MacDonald.

 7            THE COURT:  Yes.

 8            MR. HADDOW:  And I'll be extremely brief because I

 9   think, honestly, that my client's part in this is very small.

10            As the Court noted earlier in the colloquy with

11   Attorney Randazza, there is only really one possible basis on

12   which any relief might be granted against Michelle MacDonald.

13   And that would have to be that somehow the communication from

14   the Brewer School Department's counsel would be attributed to

15   her.  There's nothing that --

16            THE COURT:  That the Brewer School Department was an

17   agent acting on behalf of Ms. MacDonald and Ms. Hewey was an

18   agent acting on behalf of both.

19            MR. HADDOW:  That is what would have to be concluded.

20   Correct.

21            THE COURT:  Right.

22            MR. HADDOW:  There is absolutely no evidence here

23   whatsoever that Attorney Hewey was acting as an agent for --

24            THE COURT:  Her client.

25            MR. HADDOW:  Yeah, Michelle MacDonald.
```

```
 1            THE COURT:  Right.

 2            MR. HADDOW:  And there's also no evidence that the

 3    Brewer School Department was acting as an agent for

 4    Ms. MacDonald.

 5            Now, that doesn't mean to say that the Brewer School

 6    Department wasn't standing up for her, as it was for the other

 7    people that -- the children who were mentioned in the post.

 8    But that is not the same thing as acting as her agent.

 9            And Mr. Randazza made mention of apparent agency.

10    But in order for there to be apparent agency, it has to be

11    reasonable for someone to conclude on whatever is being

12    presented to them that the apparent agent is acting on behalf

13    of the apparent principal.

14            THE COURT:  Which probably is a closer call to so

15    conclude in the circumstance of, say, the principal and

16    superintendent --

17            MR. HADDOW:  Correct.  Correct, Judge.

18            THE COURT:  -- as opposed to -- no offense but as

19    opposed to another teacher.

20            MR. HADDOW:  Precisely, your Honor.  That's exactly

21    it.

22            And, also, that also goes directly to the second part

23    of my argument, which is Ms. MacDonald, because she's no part

24    of the administration, even if the Court should conclude that

25    the administration could take some meaningful action against
```

1    Mr. McBreairty, Ms. MacDonald doesn't -- doesn't have any

2    official capacity in which they could do that.

3          So unless, your Honor, you have further questions,

4    that's all I really have to say today.

5          THE COURT:  I don't.  Thank you very much.

6          MR. HADDOW:  Thank you, your Honor.

7          THE COURT:  Mr. Randazza.

8          MR. RANDAZZA:  Thank you, your Honor.

9          Your Honor, I'll dispense with the discussion about

10   Ms. MacDonald --

11         THE COURT:  Sure.

12         MR. RANDAZZA:  -- very quickly.

13         And if my friend would like to come back up to the

14   podium and say they had no authority to act on her behalf and

15   the fact that in this bullet list of things that my client has

16   to do or face further action, that third one is unauthorized,

17   then we would have to concede we don't need relief against

18   her.

19         I didn't hear that.  I did invite it in my opening.

20   However, I think the more concerning discussions have to be

21   about the government defendants.

22         Now, there's this claim that they don't know what

23   you're going to enjoin because they haven't sued my client

24   frivolously yet.

25         Well, if anybody in this courtroom, or we can take a

1    recess and call every single attorney we know and say, "Come

2    up with a claim that would be constitutional, that would

3    prohibit this publication," then maybe we have a different

4    argument.

5         There's nothing.  The Pentagon Papers were stolen

6    classified information, and those were subject to a dec

7    action.  Those were something that the government could not

8    stop *The New York Times* from publishing.

9         But this picture somehow has greater talismanic power

10   than stolen classified documents.  Madison wouldn't just

11   recoil or weep.  He would vomit on that.

12        THE COURT:  Well, on that -- let me try to sort of

13   narrow us in on that particular part of the argument.

14        I'm not sure if we need to -- as much as I enjoy

15   invoking the spirit of James Madison, I'm not sure we need to

16   go that high or that far.  And I'm not sure we need to go as

17   far as the Pentagon Papers to -- for you to make your point.

18        I'm back at, on the merits of the claim, isn't there,

19   at least in the preliminary stages, a colorable argument for

20   Mr. McBreairty to make that publication of the photograph --

21   which was, in part, the offending speech that the department

22   complained about -- related to a matter of public concern,

23   which was basically the rest of the corpus of his article,

24   which is the dispute with the Brewer School Department

25   policies on bathrooms and who could use them?

          1          MR. RANDAZZA:  Of course.

          2          THE COURT:  Isn't this photograph just an extension

          3    of that expression of public concern?

          4          MR. RANDAZZA:  Of course.  But we don't even need to

          5    go that far.  Even if it was just illustrative, even if it was

          6    just four people hanging around in a bathroom that had nothing

          7    to do with it, he would still be allowed to publish that.

          8          If he could have gone and pulled this off of

          9    Wikipedia or pulled it off of any social media, which is where

         10    he got it, that would still be protected.

         11          The fact that this illustrates this story raises that

         12    protection, the fact that it actually shows the subject of the

         13    story in it.  They're going to say that because it invades

         14    that person's privacy, you can't have the subject of the story

         15    in the picture?  That's -- it simply doesn't -- it doesn't

         16    track.

         17          And, you know, I would thank the -- Mr. Haddow for,

         18    you know, his statement.  And his response to that is to say

         19    it would be fair to say the Brewer School Department's

         20    policies involving school bathroom access is a matter of

         21    public concern.  Political issues regarding gender identity

         22    are a matter of public concern in the case that he cites.

         23          So he has every right to publish all the other

         24    information and opinions on that subject.

         25          THE COURT:  All right.  Thank you, Mr. Randazza.

1          You took notes feverishly.  I was watching you while

2     your counterparts were presenting their arguments.  I don't

3     want to sidetrack you from whatever you'd like to address.

4          MR. RANDAZZA:  No, no.  Please.  That's the fun part.

5          THE COURT:  All right.

6          Well, so I asked Ms. Hewey questions related to how

7     we're to interpret the email from Attorney Hewey both in terms

8     of establishing standing and in terms of at least getting out

9     of the batter's box on the First Amendment retaliation claim.

10         The school's position, she made it very clear to me,

11    is you only cited to cases that involve -- that don't involve

12    pre-enforcement actions, first of all.  And they involve cases

13    that raise the alleged unconstitutional nature of criminal

14    statutes and the prospect that those would be enforced by way

15    of a prosecution.

16         More to the point, the school is taking the position

17    that in no way can -- could I reasonably interpret her email

18    or emails as constituting a threat sufficient enough to vest

19    standing with Mr. McBreairty.  And I'd like to give you an

20    opportunity to respond to that.

21         MR. RANDAZZA:  Yeah.  Well, I did take a lot of notes

22    on that particular issue.

23         Because it seems to me that the argument was:  Since

24    the school can't do anything here, its threats were empty.

25    And since its threats were empty, there's no adverse

1  government action.  That floors me that that's the

2  government's argument.

3          If this had said, "Mr. McBreairty, stop publishing on

4  this or you're going to get an IRS tax audit ordered by us" --

5          THE COURT:  Right.

6          MR. RANDAZZA:  They could do that.  Would you be

7  telling me, would anybody be arguing that that's not the

8  government making a threat?

9          The government has threatened Mr. McBreairty.  So

10  Mr. McBreairty is then tasked with understanding that this

11  threat -- which, first, threatens to enforce school policies,

12  which he's been sued for before by the same signatories.

13          Then it actually threatens a use of a criminal

14  statute.  17-A MRS Section 511 is a criminal statute.

15          So is Mr. McBreairty supposed to say, "Well, this

16  piece of the government can't actually enforce a criminal

17  statute"?  Well, how's he supposed to know that?

18          If I got a letter from, you know, the dog catcher

19  saying that they were going to have me audited, I mean,

20  anything -- I'd know better because I'm a lawyer.  But

21  Mr. McBreairty, a mere citizen, is supposed to know that?  Is

22  supposed to track all that and say, "Well, they can't do

23  anything to me"?

24          Meanwhile --

25          THE COURT:  You're saying that a reasonable person

1  would interpret that as being the threat of at least

2  referring -- obviously, the Brewer School Department can't

3  prosecute anyone.  Are you saying that Mr. McBreairty -- it's

4  reasonable that Mr. McBreairty may have interpreted that to

5  mean they would refer it for prosecution?

6          MR. RANDAZZA:  Yes.  Or even for him not to know that

7  the school department can't do that.  He doesn't know the

8  whole structure of the Maine government.  I don't even know

9  the whole structure of the Maine government.

10          But this threat has a threat of a use of a criminal

11  statute.  So I don't know why we're all -- there's some

12  confusion on the defense side that there's no criminal statute

13  here being invoked.  It's right there.  I see it.

14          THE COURT:  Is the threat of further action, which

15  was expressed in the email, is that enough?

16          MR. RANDAZZA:  Yeah.  Your Honor, if I'm --

17          THE COURT:  Take away the -- despite what one thinks

18  about the validity of the threat of a criminal statute or we

19  have these school board policies which we are required to

20  enforce for the benefit of our student body and our staff,

21  just leave all of that aside.

22          Would the language of the email as it pertains to

23  "stop publishing this or we will be forced to take further

24  action," does that alone constitute a threat both for purposes

25  of standing and adverse action --

1        MR. RANDAZZA:  It does.

2        THE COURT:  -- for purposes of the First Amendment

3    claim?

4        MR. RANDAZZA:  It does.  I think less than that

5    would.  I think if it just said, "Stop publishing it.  Signed,

6    the government," that's enough.

7        But we're well beyond that.  It's:  "Stop publishing

8    it, or here's a criminal statute, here are some policies, and

9    here's a civil claim."

10       They ran the table.  They brought the whole trifecta:

11   administrative, civil and criminal.  I mean, it's like they're

12   sitting there with a bat, tapping themselves in the hand,

13   saying, "Get out of here or else."

14       You don't have to say, "Or else I'm going to hit you

15   with the bat."  You know why they're holding a bat.  You know

16   what the bat is for.  They're not inviting you to a softball

17   game.

18       THE COURT:  I think the -- and Ms. Hewey will correct

19   me if I'm wrong.  But the way I understood the school's

20   argument is it's a little more nuanced than that.

21       Her argument, I believe, when we were having our

22   exchange, is that the school ought to be, and is, allowed to

23   petition the Court.

24       And your client's avenue of redress is not to come

25   get what she characterizes as an advisory opinion giving

1 prophylactic effect to all of the speech that Mr. McBreairty

2 wants to give, notwithstanding school policies, criminal

3 statutes, or anything else, so long as he's raising a matter

4 of public concern.

5 And I further think that the school's argument is

6 they're allowed to go to court and ask for that relief.

7 And your client's opportunity is simply by way of a

8 counterclaim for a First Amendment retaliation claim or

9 anti-SLAPP claim or the like but that Mr. McBreairty can't --

10 this is not what Ms. Hewey said, but I believe this is what

11 was sort of not so far beneath her argument -- can't engage in

12 what I'm sure the school board now is feeling is a contrived

13 effort to gain standing to come to federal court to get an

14 advisory opinion so that he can publish whatever he wants.

15 And I want you to address that specifically.

16 MR. RANDAZZA:  Your Honor, in non First Amendment

17 context, every civil litigator gets a demand letter and then

18 says, "We should file a dec action rather than wait."  Happens

19 a lot in, say, the trademark context.

20 My client -- in a case I'm handling in Florida got a

21 demand letter saying, "Stop using our trademark or else."

22 Well, of course we filed a dec action because we want

23 to continue to sell our product without worrying about it.

24 So selling dietary supplements is not less protected

25 than engaging in journalism.  So, of course, if he gets a

demand letter, he has a right to run into federal court and

seek a declaratory judgement.  He's got a concrete threat

here, so he should be able to do it.

I think their proposed alternative is very chilling

because all -- think about their proposed alternative.

Mr. McBreairty can then wait until, I guess, whatever possible

statute of limitations could run out, then republish?

But I guess then he'd be republishing it, so reset

the statute of limitations.

So he should just shut up.  He should just stop

publishing.  How wonderful of a tool in the hands of

authoritarians would this rule of law be?  Just send out

blanket demands to every citizen who says something you don't

like them saying.  Make it vague.  And then half of them are

going to be scared and half won't.

THE COURT:  Right.

MR. RANDAZZA:  I mean, it just -- you got more

freedom than that in Singapore, much less in the United

States.  So I cannot agree with their position.

The one position I could agree with is when Ms. Hewey

was arguing that these policies cannot apply.

I want a rush transcript of this to send to the Maine

law court before they accidentally rule against me, because

that's the exact opposite argument made in *Hermon* that they

absolutely apply.

1    So that's simply not -- I mean, that's a wonderful

2    argument.  I adopt it.  But that's not what this letter says.

3    That's not what Drummond Woodsum has said to Mr. McBreairty

4    himself in the same exact context.  So again --

5         THE COURT:  If I understand --

6         MR. RANDAZZA:  -- the chilling effect is so palpable.

7         THE COURT:  No, I understand.

8         If I understand the Brewer School Department's

9    argument, though, on that last point, I -- I think what

10   Ms. Hewey was driving at is that in the *Hermon* case, there

11   were certain of the justices who were concerned about the

12   matter of standing.

13        And I think Ms. Hewey's position on behalf of her

14   client here in this case is that they can't directly enforce

15   the school policies as it pertains to Mr. McBreairty because

16   he's not a member of the Brewer school community, however that

17   might be defined.

18        MR. RANDAZZA:  Right.

19        THE COURT:  He's not a student, certainly, and he's

20   not a staff member, so they can't directly enforce those

21   policies against him as the foundation for a basis of relief.

22   But they -- that does give the school -- according to

23   Ms. Hewey, that does give the school standing.  So that's a

24   little different, isn't it?

25        MR. RANDAZZA:  Well, in this context, no.  Because

---

here, it gives the school standing to what?  Just to then sue
him under these policies, which that's what we're trying to
enjoin.  We're absolutely trying to do that.  We're trying to
stop them from taking administrative, civil or criminal
action, all of which they threatened.

          THE COURT:  Okay.

          MR. RANDAZZA:  They threatened all of that.

          Mr. McBreairty instead -- remember, it may seem --
you know, you read the article.  I understand they think it's
not polite and it's not nice.  And you know, there's a lovely
quote from a Florida appellate decision:  "The First Amendment
requires neither politeness nor fairness," *Pullum versus
Johnson*.

          But that's true.  You may not like his article.
Frankly, if I were his editor, I don't like his article.

          But that isn't the point.  That article deserves to
see the light of day as much as the Declaration of
Independence deserves to see the light of day, as much as the
article about the Pentagon Papers deserves to see the light of
day, and as much as any other article deserves to see the
light of day.

          And it is right now removed from publication because
if he puts it back -- I mean, do they want to stand up here
and say, "This was just an empty threat and we're not going to
do anything"?  Then stipulate to the injunctive relief we're

1  seeking.

2  Mr. McBreairty deserves to go back to his editor and

3  say, "Okay.  The Court has covered me.  I'm going to have the

4  right to publish this."

5  And the public, his reading public, has a right to

6  read it and a right to receive it.

7  They do not have the power -- the government doesn't

8  have rights; it has powers.  And they do not have the power to

9  shut this journalism down because they don't like it, because

10  they don't respect it, because they don't think the picture is

11  nice.  They have nothing.  There is no power whatsoever.

12  But they are threatening to wield that power, and the

13  unlimited power of the government, to go after him.  I don't

14  think that they have that power and -- but they do.  Or at

15  least they did before we filed this.

16  THE COURT:  Mr. Randazza, I want to -- we have plenty

17  of time.  So if there's anything else you'd like to draw my

18  attention to by way of this case before we move on to the next

19  one?

20  MR. RANDAZZA:  I would.  I'd like to at least address

21  your discussion about media defendant.

22  THE COURT:  Right.

23  MR. RANDAZZA:  The media has no greater rights under

24  the First Amendment than any other common citizen, so I don't

25  think it matters.

1    I think just as a factual issue it's very clear he is

2 a media defendant.  He -- we have in the record his letter to

3 his -- or his email to his editor saying, "Do you publish

4 this?"  It's a national publication that he published it in.

5    I don't see how you can say he's not a media

6 defendant, but your decision doesn't need turn on that.  If

7 you asked me to draft a draft opinion for you, I'd probably

8 say he's a media defendant with a footnote saying it just

9 doesn't matter.  Even if it was his first foray into

10 publishing, he still has the same rights.

11    It would maybe make a difference if this went forward

12 to trial and he was seeking to invoke a shield statute.  But I

13 would encourage the Court to recognize that he is a media

14 defendant just for the purposes of if -- you know, if they

15 appeal to the First Circuit, I'd like to be able to more

16 easily get amici on board from the Maine media associations

17 and whatnot.

18    But as far as your constitutional analysis, it's no

19 different than if it was somebody putting a post-it up in a

20 bathroom, for example, like in the *Norris* case, or a

21 first-time pamphleteer.

22    THE COURT:  Anything else on this case?

23    MR. RANDAZZA:  No, your Honor.

24    THE COURT:  All right.  Do you need a drink of water?

25 Because I'm going to keep you right there for the Wells case.

```
 1          MR. RANDAZZA:  I wouldn't mind, your Honor.

 2          THE COURT:  Go ahead.

 3          MS. HEWEY:  Could we take an actual --

 4          THE COURT:  Do you want a break?

 5          MS. HEWEY:  -- short break?

 6          THE COURT:  Yeah.  Let's take 10 minutes and be back

 7   at 11:40.

 8          We'll be in recess.

 9          THE DEPUTY COURT CLERK:  All rise.

10          (Recess is taken at 11:28 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2

3                    **C E R T I F I C A T E**

4

5

6        I, **Cathy J. Ford, CCR, CRR, RPR,** Certified Court

7    Reporter, Certified Realtime Reporter, Registered Professional

8    Reporter, and Official Court Reporter for the United States

9    District Court, District of Maine, certify that the foregoing

10   is a correct transcript from the record of proceedings in the

11   above-entitled matter.

12

13

14

15        __/s/ Cathy J. Ford_____
         **CATHY J. FORD, CCR, CRR, RPR**
16       UNITED STATES DISTRICT COURT REPORTER
         Date: March 29, 2024
17

18

19

20

21

22

23

24

25

# **Exhibit 2**

Order Denying Motion for a Temporary Restraining Order and for a Preliminary Injunction

UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| SHAWN MCBREAIRTY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:24-cv-00053-LEW |
| | ) | |
| BREWER SCHOOL DEPARTMENT, | ) | |
| GREGG PALMER, | ) | |
| BRENT SLOWIKOWSKI, and | ) | |
| MICHELLE MACDONALD, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION**

After counsel for Defendant Brewer School Department emailed Plaintiff Shawn McBreairty to demand that he remove certain content from an online article that he wrote, McBreairty unpublished his article and filed this lawsuit. Before the Court is Plaintiff's Emergency Motion for Temporary Restraining Order and for a Preliminary Injunction (ECF No. 4). Based upon my review of the pleadings and motion papers, and upon consideration after oral argument on March 14, 2024, the motion is DENIED IN PART insofar as Plaintiff requests a temporary restraining order. The motion is RESERVED IN PART for further proceedings on the request for a preliminary injunction.

Plaintiff remains free to publish his article as he desires, subject only to the admonition of government officials that they may petition a court to redress grievances they harbor as a result of Plaintiff's expressive activity.

My denial of the TRO and my assessment that a hearing is required are based on the following preliminary determinations:

FIRST, that standing is established by the demand email's implied threat of litigation. Based on the email's tone and the historical travel of Attorney Hewey, her firm, and Mr. McBreairty, litigation was substantially likely unless McBreairty complied with the demands. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur" (internal quotation marks omitted)).

SECOND, that this case presents nuanced questions, and the current record and briefing do not allow me to find that Plaintiff has demonstrated a likelihood of success on the merits. Plaintiff asks that I enjoin Defendants' exercise of First Amendment freedoms (their right to petition the courts) in favor of his exercise of First Amendment freedoms (the right to criticize the government). As Defendants correctly, although imprecisely observe, Plaintiff's requested injunctive relief implicates Defendants' "right to bring a civil action," which "is itself protected by the First Amendment." Defs.' Resp. at 13; *see also Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 741 (1983) (explaining "that the right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances"). Despite Defendants' conclusory argumentation on this point, even a conclusory argument deserves serious consideration in the context of a request that a federal court enjoin litigation. Further examination into whether Plaintiff's requested injunctive relief would itself violate Defendants' First Amendment right to petition the courts for redress is necessary. *See Sindi v. El-Moslimany*, 896 F.3d 1, 29 (1st Cir. 2018)

(recognizing "a court's limited authority, consistent with its equitable jurisdiction and the First Amendment, to enjoin speech" and characterizing such relief as having "major institutional implications for the federal judiciary"); *id.* at 29–30 (noting the court's "ongoing duty to review the efficacy and consequences of an injunction takes on special importance in the First Amendment context" because "such an injunction carries significant 'risks of censorship and discriminatory application,'" and "the Supreme Court has directed judges to scrutinize injunctions restricting speech carefully and ensure that they are 'no broader than necessary to achieve [their] desired goals'" (alteration in original) (quoting *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 764–65 (1994)).

Because the First Amendment protects access to the courts, the Supreme Court has cautioned that "enjoining a lawsuit could be characterized as a prior restraint." *BE & K Const. Co. v. NLRB*, 536 U.S. 516, 530 (2002); *see also Alexander v. United States*, 509 U.S. 544, 550 (1993) (describing "[t]emporary restraining orders and permanent injunctions" as "classic examples of prior restraints"). "There is a strong presumption that prior restraints on speech are unconstitutional." *Sindi*, 896 F.3d at 32. However, "baseless litigation is not immunized by the First Amendment right to petition." *Bill Johnson's Rests., Inc.*, 461 U.S. at 743; *Pro. Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60–61 (1993) (outlining a "two-part definition of 'sham' litigation" in an antitrust case); *BE & K Const. Co.*, 536 U.S. at 531 (describing the Court's holdings as having "limited regulation to suits that were both objectively baseless *and* subjectively motivated by an unlawful purpose"); *see also Tomaiolo v. Mallinoff*, 281 F.3d 1, 11 (1st Cir. 2002) ("Several circuits have held, and this one has at least hinted, that in view of the

3

First Amendment the courts should avoid an interpretation of § 1983 so broad as to encompass petitions for government action." (citing *Tarpley v. Keistler*, 188 F.3d 788, 793–95 (7th Cir. 1999) (collecting cases)).   Based on the current briefing and argumentation, I am unable to presently determine whether Plaintiff's request for injunctive relief would violate Defendants' First Amendment rights.

Accordingly, Plaintiff's Emergency Motion for Temporary Restraining Order and for a Preliminary Injunction (ECF No. 4) is **DENIED IN PART**.  The request for a TRO is denied.  The remainder of Plaintiff's Motion (his request for a preliminary injunction) is **RESERVED** pending further proceedings.  The Court will schedule the matter for an evidentiary hearing on Plaintiff's request for a preliminary injunction.  The parties are advised to confer regarding the schedule, including the need for discovery, and the possibility of consolidating the hearing with the trial on the merits pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure to facilitate the most efficient resolution of the matter.

SO ORDERED.

Dated this 28th day of March, 2024.

/s/ Lance E. Walker
Chief U.S. District Judge

# Exhibit 3

Order Denying Motion for an Injunction
Pending Appeal

UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| SHAWN MCBREAIRTY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:24-cv-00053-LEW |
| | ) | |
| BREWER SCHOOL DEPARTMENT, | ) | |
| GREGG PALMER, BRENT | ) | |
| SLOWIKOWSKI, and MICHELLE | ) | |
| MACDONALD, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON EMERGENCY MOTION FOR INJUNCTIVE RELIEF  PENDING APPEAL

Plaintiff Shawn McBreairty requests an injunction pending appeal following the Court's denial of a temporary restraining order.  Pl.'s Emergency Mot. for Inj. Pending Appeal (ECF No. 33).  Because Plaintiff has not presently demonstrated a likelihood of success on the merits, the Motion is denied.

A motion for an injunction pending appeal is subject to the same, familiar standard as the underlying request for a temporary restraining order.  *Respect Me. PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010).  However, a court may also consider whether the appeal raises "serious legal questions" and whether denial of the request would compromise the appellant's access to "meaningful review."  *NCTA - Internet & Television Ass'n v. Frey*, No. 2:19-CV-420-NT, 2020 WL 2529359, at *2 (D. Me. May 18, 2020) (quoting *Providence Journal Co. v. Fed. Bureau of Investigation*, 595 F.2d 889, 890 (1st Cir. 1979)).

As always, the likelihood of success on the merits remains the weightiest factor. *Acevedo-Garcia v. Vera-Monroig*, 296 F.3d 13, 17 (1st Cir. 2002) (per curiam).

As for the likelihood of success, I explained in my previous order that Plaintiff is free to publish his article as he desires, and that before Defendants will be ordered not to bring a civil action based on the content of Plaintiff's article (the only avenue of redress Defendants might have against Plaintiff, as they have no actual state-sanctioned authority to censor Plaintiff or otherwise compel Plaintiff to comply with their wishes), it is necessary to examine whether the cure he proposes (a court-ordered prior restraint imposed against Defendants' right to petition a state court for relief) is worse than the disease (a letter from counsel on behalf of a public school warning of further action if certain demands are not met).

Plaintiff cries foul because, in his view, the mere delivery of counsel's letter and related communications (and a lawsuit a different public high school filed against him in state court) deprived him of a constitutional right, and he has sued the defendants exclusively on that basis. Plaintiff misses the operative point and in the missing, he requests that I spell out for him at length the kind of evidence I believe would be material to a preliminary injunction hearing, complaining that he has no ability to guess what other evidence might matter. *See* Reply at 2 (ECF No. 39). I previously cited authorities he might consider reading, which authorities question whether the First Amendment erects a bulwark against prior-restraints-by-injunction that would prohibit a defendant from petitioning a state court for redress of grievances. Those authorities contemplate both an

objective and a subjective standard designed to flush out "sham" litigation and whether the threat of litigation by counsel constitutes such "sham" litigation.

As for Plaintiff's concern with my prior suggestion that the parties consider consolidating preliminary injunction proceedings with merits proceedings,[1] I overlooked the fact that Plaintiff has demanded trial by jury on his claims, including claims for money damages. Matters like this most often proceed expeditiously on a jury-waived basis and lack claims for damages. Obviously, the preliminary injunction hearing will need to be set in advance of a jury trial. Nothing in my Order foreclosed Plaintiff from simply requesting a prompt hearing on his motion for preliminary injunction if his aim is to efficiently remedy his alleged constitutional injury. Instead, Plaintiff filed a notice of appeal. While the Court waits with bated breath for the First Circuit to return its mandate, the Court will be as poised then as it is now to calendar, promptly, the preliminary injunction hearing to consider the emergency relief Plaintiff seeks.

CONCLUSION

---

[1] The concluding paragraph of my order denying the TRO states:

> The Court will schedule the matter for an evidentiary hearing on Plaintiff's request for a preliminary injunction. The parties are advised to confer regarding the schedule, including the need for discovery, and the possibility of consolidating the hearing with the trial on the merits pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure to facilitate the most efficient resolution of the matter.

Order on Pl.'s Mot. for TRO at 4 (ECF No. 30). I do not understand how Plaintiff interprets this suggestion as inconsistent with the possibility of a prompt hearing on his request for a preliminary injunction. *See* Emergency Motion at 6; Reply at 4.

Because a prompt hearing on the request for a preliminary injunction would not compromise Plaintiff's access to meaningful review, Plaintiff's Emergency Motion for Injunction Pending Appeal is DENIED.

SO ORDERED.

Dated this 10th day of April, 2024

/s/ Lance E. Walker
Chief U.S. District Judge

# Exhibit 4

Email from Attorney Hewey
February 13, 2024

**From:** "Melissa A. Hewey" <MHewey@dwmlaw.com>
**Date:** February 13, 2024 at 4:22:22 PM EST
**To:** ▮▮▮▮▮▮▮▮▮▮
**Cc:** "Jeana M. McCormick" <JMcCormick@dwmlaw.com>
**Subject: Brewer High School**

Dear Mr. McBreairty,

I am writing on behalf of our client the Brewer School Department to demand that you remove certain content from your February 12, 2024 online post entitled "Girl's Bathrooms Are Not 'Safe Spaces' When Males are Present." If you are represented by counsel in this matter, please let me know and I will be glad to direct my correspondence to them.

Although we acknowledge that much of that post contains your opinions on matters of public concern and recognize your right to express them, there are certain portions that are not protected because they are either false or an impermissible invasion of the privacy of minors and have the effect of bullying and hazing a student and a teacher at the Brewer High School in violation of Board Policies ACAD, ACAF and JICK and Maine law. In particular:

First, there is a picture of Brewer High School students in the restroom. As we understand it, this picture was taken without their consent, presumably in violation of 17-A M.R.S. Section 511.

Second, there are the following two statements concerning a Brewer High School student that identifies the student specifically:

   Hunter Dawson, aka "Jax" is a senior at Brewer High School. He goes by the pronouns they/them on Instagram and his profile name is "dumbjaxdawson." He's been allowed by the administration to continue to enter female spaces for the last three months. Even after students' concerns were reported. He once stated he was "too emo for this school," but now he is literally playing dress up, because the school policy allows it to continue and no one has the balls to stop it.

   There have been various social media posts that "...he is alleged to have touched some female student(s)." Additional, yet unconfirmed reports state he is accused online of a "sexual assault" of a fellow student "in late 2021." There was another post stating "...in September (sic) of 2022 i (sic) was taken advantage of by (Hunter) Jax Dawson." Sources state these are "different people" making these serious claims. Is the school aware of these claims? Some say they are.

Third, there is a statement concerning the minor child of one of our teachers:

   MacDonald has a transgender child who attends a different school (Hampden Academy. She's a girl who pretends to be a boy on the male track team, usually coming in dead last).

All of the above are invasions of privacy of the students you have referred to and are causing the Brewer High School student and the Brewer High School staff member who is the parent of the other student you refer to severe distress within the meaning of Maine statute, 20-A M.R.S. Sections 6553 and 6554.

Please remove the referenced material by noon on February 14, 2024 and confirm to me that you have done so or we will be forced to take further action against you.

M